LENA BENDER, EXECUTRIX, ET AL., v. R. F. BROOKS ET AL.

No. 2004. Decided April 20, 1910.

**1.—Limitation—Adverse Possession—Enclosure Beyond Boundary.**

Evidence considered and held insufficient to support a submission of the issue of five years limitation in favor of one who, having a recorded deed to 663 acres of land, permitted the owner of an adjoining survey to extend his enclosure onto and make use of a small portion of the land in question. Such enclosure was not notice of adverse possession in favor of the party so permitting it, against the true owner, to any part of the land beyond that actually enclosed. (Pp. 331–335).

**2.—Trespass—Taking Oil from Land—Damages.**

The measure of damages recoverable by the owner of land from one who, in good faith, believing that he had title, enters upon and takes oil from the land, is the market value of oil taken when produced into the tanks or pipe lines on the premises, less the reasonable costs and expenses of producing it there. (P. 335, 336).

**3.—Same.**

The recovery of a land owner for oil taken from his land by another, a trespasser, but acting innocently on belief in his own title, is not limited to the value of the oil in the ground nor, except under special circumstances, to the royalty usually allowed the owner. (P. 336).

Questions certified from the Court of Civil Appeals for the First District in an appeal from Harris County.

*Carlton & Towns, Hogg, Gill & Jones, Frank S. Burke* and *John Hamman,* for appellants.—While general expressions may be found in the decisions everywhere that the owner of a tract of land is the owner of the oil underlying the same, these statements will be found

in cases working out the now established proposition of law that a landowner has the title to all the oil that comes through a well sunk on his land. This, however, can not be interpreted to mean that the boundaries of a tract of land mark a fixed deposit of oil underlying the same, and that the owner thereof has title to a particular volume of substance that is in the earth below this land. He does not own any particular oil *in situ* but simply owns what he can get out of wells sunk on his land and his title to this substance as a piece of property does not come into existence until the oil is severed and becomes a chattel. Watford Oil & Gas Co. v. Shipman (Ill.) 84 N. E., 53; Kelly v. Ohio Oil Co., 39 L. R. A., 765; Ohio Oil Co. v. Indiana, 177 U. S., 190; Hall v. Vernon, 49 L. R. A., 464; Thornton on Oil and Gas, secs. 24, 25, 33; Kelly v. Keys, 62 Atl., 911; Sunnyside C. & C. Co. v. Reitz, 39 N. E., 541; Ivy C. & C. Co. v. Alabama C. & C. Co., 33 So., 547; Costigan on Mining Law, sec. 134a, p. 513.

The occupancy, use and enjoyment, with adverse claim, of a small strip of land across a land line, the area of which is wholly disproportionate in size to the whole tract, is not sufficient to create the bar of limitations as to the whole tract. Puryear v. Friery, 40 S. W., 446; Hedrick v. Kilgore, 121 S. W., 892; Callen v. Collins, 120 S. W., 547; Downs v. Powell, 116 S. W., 873; Houston Oil Co. v. Kimball, 122 S. W., 533; Jones v. Weaver, 122 S. W., 619; Bartine v. McElroy, 123 S. W., 1174.

*Fisher, Sears & Campbell, W. G. Sears, Presley K. Ewing, Hutcheson, Campbell & Hutcheson, Andrews, Ball & Streetman, L. B. Moody* and *Greer, Minor & Miller,* for appellees.—The evidence was amply sufficient to present the issue of five years limitation as to the part of the Dunman 663 acres outside of the Rankin-Busch inclosure. That where the relation of landlord and tenant is once established, it attaches to all who may succeed in the possession through or under the tenant, either immediately or remotely, and that where one has assumed the rights of a tenant, the owner may so treat him, and though there is no contract between them, he will be estopped from denying the tenancy. Word v. Drouthett, 44 Texas, 371; Cobb v. Robertson, 99 Texas, 138; Buford v. Wasson, 49 Texas Civ. App., 454, error refused; Oury v. Saunders, 77 Texas, 280; Carter v. La Grange, 60 Texas, 636; Mattfeld v. Huntington, 17 Texas Civ. App., 720; Willison v. Watkins, 3 Pet. (U. S.), 47-48; Bedlow v. New York Floating Dry Dock (N. Y.), 2 L. R. A., 629, 636; Jackson v. Davis, 5 Cowen (N. Y.), 129; 1 Cyc., 1062; Woods' Limitations, sec. 265, and note.

That Busch's possession was Mason's possession during the time he was on the land, as the jury was reasonably warranted in finding under the defendants' testimony: Flanagan v. Pearson, 61 Texas, 304; League v. Snyder, 5 Texas Civ. App., 15; Udell v. Peak, 70 Texas, 550; Fowler v. Simpson, 79 Texas, 617; Juneman v. Franklin, 67 Texas, 415; O'Connor v. Dykes, 29 S. W., 920; Jackson v. Scissam, 3 Johnson (N. Y.), 503; Bedlow v. New York Floating Dry Dock Co. (N. Y.), 2 L. R. A., 636; Jackson v. Davis, 5 Cowen,

129. That the open and visible possession, with cultivation and use of the five acres, it being of "irregular shape" and "in a kind of a circle," and held by tenants with the right of possession to the entire tract of 663 acres, and not restricted to less, made Mason's constructive possession for limitation coextensive with the boundaries of the entire tract as specified in his duly recorded deed. Haynes v. Texas & N. O. Ry. Co., 111 S. W., 428; Neyland v. Lumber Co., 26 Texas Civ. App., 417; Brownson v. Scanlan, 59 Texas, 225; McCarty v. Johnson, 20 Texas Civ. App., 185; Allison v. Pitkins, 11 Texas Civ. App., 656; Tarlton v. Kirkpatrick, 1 Texas Civ. App., 113; Mattfeld v. Huntington, 17 Texas Civ. App., 719; City of El Paso v. Ft. Dearborn Nat. Bank, 96 Texas, 496; Bracken v. Jones, 63 Texas, 187.

The defendants, acting under a bona fide claim of title in taking out the oil, and hence not intentional or wilful wrongdoers, would be liable, if at all, for the value of the oil in the ground "at the same rate as if the property taken had been purchased in situ by the defendants, at the fair market value of the district." Sandy River Cannel Coal Co. v. Whitehouse Cannel Coal Co. (Ky.), 101 S. W., 319, 320, and cases cited; Forsyth v. Wells, 41 Pa. St., 291, 80 Am. Dec., 617, and note at p. 620; Dougherty v. Chesnutt (Tenn.), 5 S. W., 444, 446; Coal Creek Mining & Mfg. Co. v. Moses, 15 Lea, 300, 54 Am. Rep., 415, and note at p. 422; Bolles Woodenware Co. v. United States, 106 U. S., 432; Colorado Cent. Consolidated Mining Co. v. Turck, 17 C. C. A., 128, 70 Fed., 294; 20 Am. & Eng. Ency. of Law, 2d ed., 792; George v. Hesse, 100 Texas, 45; Smith v. Bolles, 132 U. S., 125-132.

MR. JUSTICE BROWN delivered the opinion of the court.

Certified question from the Court of Civil Appeals for the first district as follows:

"This cause is pending before us on appeal.

"This is an action of trespass to try title, brought by C. Bender, Sr., against R. E. Brooks and others to recover ten acres of land out of a tract of 663 acres in the Robert Dunman survey in Harris County, and for damages on account of taking from said ten acres by defendants of a large quantity of petroleum oil. C. Bender died pending the suit, and his widow, Lena Bender, qualified as executrix of his will and made herself party plaintiff to the action. E. F. Simms intervened, claiming to have purchased the title to the land from C. Bender, Sr., as well also as the cause of action for taking the oil. The defendants pleaded not guilty and the statutes of limitations of five and ten years.

"Upon the issue of limitation of five years the following facts were established by the evidence:

"The 663 acres of the Dunman, of which the ten acres in controversy is a part, together with the Strange survey, which adjoins it on the west, was conveyed to Mason by R. Tilbrook by deed dated April 16, 1896, and duly recorded in the deed records of Harris County, on October 16, 1896. May 18, 1901, Mason executed a power of attorney to E. L. Dennis to sell and convey the land. Acting under this power of attorney Dennis, as agent for Mason, on October 8, 1904,

by deed recorded November 16, 1904, conveyed to R. E. Brooks the land involved in this suit. .

"The 663 acres of the Dunman adjoined the Strange survey. Some time in the year 1895 Dennis, acting as agent for Mason, contracted to sell to one Rankin a tract of thirty-five acres out of the east side of the Strange survey immediately adjoining the Dunman tract. No deed was executed by Dennis or Mason to Rankin for this thirty-five acres. Rankin moved on to the tract so contracted to be purchased by him, and in the fall of 1895 or spring of 1896 he applied to Dennis, as Mason's agent, for the use of some of the land on the Dunman, and a verbal agreement was made between them whereby Rankin was to have the use of the Dunman in consideration of his looking after it, taking care of it, keeping trespassers off, etc. There were no restrictions as to what part of the Dunman Rankin should occupy. Rankin asked of, and was granted by, Dennis, permission to use some of the Dunman for field purposes, and Dennis agreed that he could fence whatever he wanted for that purpose. Rankin in constructing his fences on his thirty-five acres of the Strange survey extended the inclosure over on to the Dunman so as to include therein a quantity of land on the Dunman, variously estimated by the witnesses as including, in extent, anywhere from a space thirty by fifty feet, to five acres. The space so inclosed was of irregular shape. The tract of Rankin, on the Strange, and the part of the Dunman fenced by him were under one inclosure. Rankin cultivated the inclosed part of the Dunman for two years and then moved away, leaving his son-in-law, Jones, living on the thirty-five acres and occupying it and the inclosed part of the Dunman for him. Jones knew what Rankin's rights and duties were as to the Dunman. He cultivated the inclosed land during the year 1898, and held until December 6 of that year, when he turned it over to J. C. Busch, who, in December, 1898, purchased from Rankin the latter's improvements on the thirty-five acres of the Strange, consisting of a house, barn and fence, and purchased from Mason, through Dennis, the thirty-five acres of the Strange theretofore occupied by Rankin and Jones, and in said month moved onto this tract. At that time the improvements included the part of the Dunman inclosed by Rankin. Busch resided on the land, purchased by him, continuously for six years and seven months, cultivating during said time the inclosed portion of the Dunman as well as his own tract.

"Dennis testified that when Busch purchased from Rankin he asked witness if he could have the same arrangement in regard to the Dunman that Rankin had, and that witness told him he could, and that witness made the same arrangement with him. This was denied by Busch, who testified that he did not remember having any such agreement or understanding with Dennis; that he never did speak to Dennis about holding that part that was over on the Dunman; that the fence ran over on the Dunman, in a kind of a circle, and included four or five acres; that his land and the Dunman was all under fence together and that he worked the whole; that when he went there in December, 1898, the fence was out there on the Dunman and that he kept it there during the six years and seven months he was there;

that the fence on the Dunman was taken down before he left the place; that he did not know whether it was his or whose it was; that the 'whole thing was there together,' and that he had never had it surveyed until he began to sell off the land and that he did not know where his corners were; that he never saw Dennis about cutting any timber off the Dunman or keeping people from taking it; that he did not remember Rankin telling him about having any arrangement for holding the land on the Dunman; that he was certain he did not ask Dennis for the same arrangement that Rankin had about holding land on the Dunman; that he never knew to whom the Dunman belonged until the oil field was developed; that the land looked like wild land, and nobody ever paid any attention to it; that he was not claiming the land for Mason or anyone else.

"Mrs. Rankin testified: 'At the time my husband sold out to Mr. Busch, he told Mr. Busch that he had an agreement with Mr. Dennis that he could hold possession of the Dunman survey which was fenced in, and he told Mr. Busch that he could cultivate that just the same as he did, under the same terms.' Busch had been in possession of the thirty-five acres of the Strange and the inclosed portion of the Dunman for something more than thirty days at the time Dennis claimed he made the same arrangement with him that he had with Rankin.

"There were no fences or other improvements on the 663 acres except those made by Rankin and maintained by Jones and Busch.

"Mason paid all taxes on the 663 acres for five years concurrently with Busch's possession, claiming the land under the conveyance from Tilbrook.

"Dennis, on cross-examination, testified: 'It is a fact I was interested in this Dunman; that I claim the 663 acres of land down there at Humble; I said I had an ownership in that land; I acquired it by purchase from Mr. Mason; Mr. Mason did not give it to me; Mr. Mason did not give a part interest in that property to my wife; I stated I got it from Mason; the extent of my interest is the entire interest; I can't tell you how long I have had the entire interest. I have had it long before the oil disturbances, if that is what you want to know, back of that; I have owned it away on back as much as six or seven years, probably more than that; I don't remember."

" 'Q. Have you got a deed of it on record?'  'A. No, sir; there is no deed of record.'

" 'Q. There is no deed of record; is that your answer?'  'A. Yes, sir.'

"(The witness gave this testimony between the 24th day of February and the 9th day of March, 1908.)

"We find that R. E. Brooks upon his purchase of the land went into possession thereof, and at great expense erected the necessary machinery for the purpose of developing the oil, raising the same to the surface and storing and marketing the same, and that he has by the use of these means developed the oil and has extracted, stored and marketed large quantities thereof. The evidence would authorize a finding that in taking possession of said land and developing it Brooks acted in good faith, believing, and having good reason to

believe, that he had a good and indefeasible title to the land and lawful right to appropriate the oil; and the further finding that the oil as it was in the ground had an ascertainable value in the way of royalty or a proportionate part of the same after it was developed and raised to the surface and stored.

"Upon the measure of damages the court charged the jury as follows:

" 'If you believe from the evidence that the defendants who took the oil from such premises did so not as intentional or conscious wrongdoers, but in good faith, under the belief that they, or those in whose rights they held, were the true owners of the land, then find for plaintiff and intervener the market value of the oil at the times when produced into the tank lines or pipes on the premises, less the reasonable costs and expenses necessarily incurred in producing it there.'

"By cross-assignment the appellee complains of this charge in that it does not give the proper measure of damage, said cross-assignment being as follows:

" 'The defendants, acting under a bona fide claim of title, in taking out the oil, and hence not intentional or wilful wrongdoers, would be liable, if at all, for the value of the oil in the ground "at the same rate as if the property taken had been purchased in situ by the defendants, at the fair market value of the district." And the trial court erred in not thus charging the rule of damages, as asked by defendants.'

"Upon the foregoing statement we respectfully certify for your decision the following questions:

"First. Does the evidence present the issue of five years limitation as to any of the Dunman 663 acres outside the Rankin-Busch inclosure?

"Second. Did the charge above quoted give the jury the correct measure of damage?"

We answer the first question in the negative and the second question in the affirmative.

The evidence is sufficient to raise the issue of limitation of five years, if the character of the possession was adverse to the true owner of the land. To simplify the question we will consider it as if Mason had been in possession in person. In order for possession to be adverse to the true owner it "must be of such a character as to indicate unmistakably an assertion of claim of exclusive ownership in the occupant." Mhoon v. Cain, 77 Texas, 318; Bracken v. Jones, 63 Texas, 186; Holland v. Nance, 102 Texas, 177; McCarty v. Johnson, 20 Texas Civ. App., 187.

In Bracken v. Jones the possessor, who claimed by limitation a larger tract, had fenced land owned by himself and on which he resided, including in his field four acres of an adjoining tract. The possession continued sufficient time to give title under the statute and the party in possession claimed the entire tract of which he had the four acres enclosed. This court held that as to the land not under fence there was no such adverse possession as would give notice to the true owner that the occupant intended to claim the entire survey.

In the case now before us as in the case just quoted the house and all improvements except a portion of the fencing was upon another tract of land. The use of the field was incidental to the use of the house and the possession of the field in its entirety could be referred only to the possession of the house and the other land enclosed within the field. The enclosure gave not the slightest intimation to the true owner that the person who was residing upon the thirty acres of the adjoining tract was setting up claim to the entire survey of 663 acres. The evidence does not tend to prove a possession adverse to the owner of the Dunman survey. We therefore hold that the evidence submitted with this certificate did not justify the court in submitting the issue of limitation to the jury.

It is true that appellants, as owners of the land, had no specific title to the oil therein until it had been removed from the earth. Costigan on Mining Law, p. 474, note 18; Kelley v. Ohio Oil Co., 57 Ohio St., 317.

In the case last cited the court said: "Petroleum oil is a mineral, and while in the earth it is part of the realty, and should it move from place to place by percolation or otherwise, it forms part of that tract of land in which it tarries for the time being, and if it moves to the next adjoining tract, it becomes part and parcel of that tract; and it forms part of some tract, until it reaches a well and is raised to the surface, and then for the first time it becomes the subject of distinct ownership separate from the realty, and becomes personal property, the property of the person into whose well it came. And this is so whether the oil moves, percolates or exists in pools or deposits. In either event, it is property of, and belongs to, the person who reaches it by means of a well, and severs it from the realty and converts it into personalty."

Appellants had the exclusive right as owners of the soil to take oil therefrom and the appellee by an invasion of their right and removal of the oil, no matter how innocently, could not acquire title thereto. It follows logically that since appellants owned the land from which Brooks extracted the oil, the oil so removed became and was the property of the appellants so soon as it reached the surface, therefore, they had a right to recover their property or its value.

There is no conflict in the authorities upon the proposition that the mineral in the land continued to be the property of the land owner after it was removed from its bed or place in the soil. The controversy arises over the method by which the rights of the parties shall be adjusted. If Brooks had been an intentional trespasser in removing the oil, there would be no complications, for he would be responsible for its value without compensation to him for his labor or money expended in producing it. We shall therefore not consider that character of case; what we shall say has application only to the case in which the trespass was unintentional and where the trespasser acted under a claim of title in good faith, believing that he was the owner of the soil. The rule applicable to such facts is stated thus: "It is the prevailing rule that in an action for unlawfully working a mine and extracting coal or ore therefrom, if the taking was not a wilful trespass, but was the result of an honest mistake as to the true

ownership of the mine, the measure of damages is the value of the coal or ore as it was in the mine before it was disturbed. The recovery in such case is limited, first, by the value of what is taken, and, second, by the cost of mining, extraction and hoisting to the surface or delivering at the pit's mouth." (20 Am. & Eng. Ency., p. 792.)

In this class of cases there is a conflict as to whether a trespasser in good faith shall be allowed the cost of separating the mineral from the soil, but it is unnecessary for us to discuss that question because it is not presented by the facts certified. Brooks being an innocent trespasser, the account between him and the landowner should be taken by ascertaining the value of the oil when delivered at the surface or in tanks, deducting the cost of lifting it from the well and placing it in the tanks; the difference would be the sum to which the appellant would be entitled. 20 Am. & Eng. Ency., 792, note 1; Woodenware Co. v. United States, 106 U. S., 434; White v. Yawkey, 54 Am. St., 161, 108 Ala., 270; Williamson v. Jones, 38 L. R. A., 694; Omaha & G. S. & R. Co. v. Tabor, 16 Am. St., 197; Chamberlain v. Collinson, 45 Ia., 429.

Counsel for appellee insists that the landowner should be allowed the usual royalty, that is, such as is commonly allowed in that vicinity for producing the oil from the ground and in support of his contention cites the following cases: Dougherty v. Chesnutt, 5 S. W., 444; Sandy River C. C. Co. v. Whitehouse C. C. Co., 101 S. W., 319. In each of these cases, and others, wherein the "usual royalty" was adopted as the measure of damages, there were circumstances which induced the court to approve that measure of compensation. In Dougherty v. Chesnutt the court adopted the rule expressed in the charge, although the statement quoted by counsel is found in the opinion.

An examination of those cases will show that in each there were special circumstances which caused the courts to apply that rule. We find nothing in the facts of this case which calls for or justifies a variance from the general rule announced upon the subject in the authorities cited and the greater number not cited herein.

The law will determine the rights of the parties, but equity will adjust the account between them upon the doctrine which applies to innocent purchasers in good faith who make improvements upon land which adds to its value. The owner gets his property and the innocent occupant is remunerated for his labor and money expended in making the improvements.