O'HANLON et al. v. MORRISON. (No. 1002.)

(Court of Civil Appeals of Texas. Amarillo. May 24, 1916.)

1. ADVERSE POSSESSION  71(2)—COLOR OF TITLE—VOID DEED.

A void deed does not constitute color of title required by the three-year statute of limitations.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 417–421, 424–426, 428; Dec. Dig.  71(2).]

**2. TAXATION ☜789(3)—TAX DEEDS—VALIDITY.**

A tax deed is not evidence of title unless the authority of the maker of the deed is shown by proof of compliance with the requirements of law conferring authority to make the sale.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1558; Dec. Dig. ☜789(3).]

**3. ADVERSE POSSESSION ☜60(4)—REQUISITES—HOSTILE CHARACTER OF POSSESSION.**

Under Rev. St. art. 5681, defining adverse possession as an actual and visible appropria-tion of the land commenced and continued under a claim of right inconsistent with and hostile to the claim of another, where the defendant used a vacant lot for tying stock in common with others, and storing lumber and wire in a manner consistent with subordination to the title of the owner, and first used it under a claim of right in 1904 under a tax deed made to another, and gave no notice of his change of intention to a hostile possession until a year or so before he fenced the land three years before the beginning of the action, his holding until three years before the action was not inconsistent with or hostile to the owner or an actual visible appropriation as to indicate unmistakably an assertion of claim of exclusive ownership sufficient to give him title under the ten-year statute of limitations.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 288–293; Dec. Dig. ☜60(4).

For other definitions, see Words and Phrases, First and Second Series, Adverse Possession.]

**4. ADVERSE POSSESSION ☜79(4) — HOSTILE CHARACTER OF POSSESSION—TAX DEED.**

Possession in a tax deed is not adverse to the title of the owner, and cannot be used as a basis for possession under the statute of limitation until after the period of two years allowed for redemption.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 462; Dec. Dig. ☜79(4).]

**5. ADVERSE POSSESSION ☜36—REQUISITES—CONTINUOUS OWNERSHIP.**

The facts were not sufficient to show a continuous or exclusive use of the property.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 139–143; Dec. Dig. ☜36.]

**6. ADVERSE POSSESSION ☜29—REQUISITES—APPROPRIATION.**

To constitute adverse possession, the person occupying the land must appropriate it to some purpose for which it is adapted, since mere occupancy of the land, without evidence showing an intention to appropriate it, will not support the statute.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 124, 125; Dec. Dig. ☜29.]

Appeal from District Court, Grayson County; W. M. Peck, Judge.

Action by F. L. O'Hanlon against W. A. Morrison and others. From a judgment for the named defendant, the plaintiff and other defendants appeal. Reversed and remanded.

J. W. Finley, of Sherman, for appellants. Cox & Cox, of Sherman, for appellee.

HUFF, C. J. O'Hanlon instituted an action of trespass to try title against W. A. Morrison, J. H. Hollingsworth, Van Dyke Todd, and B. W. Gulick, to recover lot No. 3, in block No. 41 of College Park addition to Sherman. The petition sought a recovery against Gulick, the vendor of appellant, under a warranty for the purchase money paid should he fail to recover the land. W. A. Morrison answered among other things the three, five, and ten year statute of limitation, also alleging a purchase from Hollingsworth, who purchased at tax sale, and the failure of appellant to redeem in two years. Hollingsworth, Todd, and Gulick did not answer. The case was submitted to a jury, who found for Morrison upon his plea of three and ten year limitation, and in favor of O'Hanlon against Gulick, for $125, and judgment was accordingly so rendered.

The appellant showed title in himself and the trial court so instructed the jury, unless defeated by the statutes of limitation pleaded by Morrison. Morrison claims under a tax deed sold for taxes, due the city, by the collector of that city. The deed itself is not in the record, but apparently the witnesses who testified to it had it before them, and referred to it as being dated March 1, 1904. It appears J. H. Hollingsworth purchased at the tax sale and did so for Morrison. The tax deed was made to Hollingsworth, and he and Morrison testified that he conveyed the lot by deed to Morrison. This deed appears to have been lost, and thereafter a substitution deed was executed, which was placed of record some time in 1914. There was nothing showing assessment or levy of taxes. No judgment was offered foreclosing the tax lien; in fact, nothing was shown except the tax deed, if indeed that can be said to have been in evidence. The suit for the lot was filed August 27, 1914, and the trial was had February 2, 1915. The evidence shows the lot in question was vacant, without any improvements on it of any kind until a little less, as stated by the witness, than three years before the trial; or something like two years before the suit was filed, when Morrison fenced the lot. Morrison testified:

"In March, 1904, I was tax collector of Grayson county. At that time I had Mr. Hollingsworth to do something in reference to lot 3, block 41, College Park addition to the city of Sherman. I had him to buy it at a tax sale. My recollection is I had to leave town on the day it was to be sold; is why I had him to buy it. I bought it because I needed it as a kind of store place for things that I would have around that I couldn't keep on my other lot. I had been using the lot before that. It must have been four or five years that I had been using it. In fact, I was using it all the time since I moved over there. I moved over there in the winter of 1897, I think it was, 1896 or 1897, I don't remember how long it was after I moved there before I began to use this lot. It wasn't but a short time. Probably the next spring. I used it for various purposes. I have used it for pasturing; that is, lariating on it and pasturing. I mean I tied my cow and horse on it. I used it also for standing my wagons on, and have had some mowers on it, or one mower I remember; piled lumber on it sometimes, right often I have used it nearly all the time since I moved there, quite all the time for various purposes; not for any one thing all the time. I will say that I have used it about all the

time, for the purposes which I have stated to the jury, stored lumber, mowing machines, farming implements and wagons, buggies; sometimes put some wire on it a time or two, wire that I wasn't using. I started using that lot in that manner, I think, within a year after I moved there. I think a year would cover it. Don't think it was that long. That would be since about 1897 or 1898. I have continued to use the lot up to the present time in the manner in which I started to use it. No one has interfered with my peaceable use of the lot. No one has done anything to prevent me from using the lot, not until this suit was brought. I don't remember the date when the suit was brought. I fenced the lot, and put up some feed troughs on it. I think that was three years ago this coming spring. When I first started using this lot there was a house on lot 4. This lot 3 was a vacant lot; nothing on it at all. There was some little brush on it; this black locust, I believe. I frequently made inquiry along about that time about who owned the lot. I never could find out who owned it. I was using it before I started to find out who owned it. I wanted the lot; needed it; and couldn't find out who owned it, and that caused me to take the course I did toward using this lot. I went to the records down stairs in the county clerk's office to try to find out who owned it. I didn't find out much of anything there. No one ever approached me at any time that I remember of with reference to signing a lease on the lot. Mr. O'Hanlon has spoken to me a time or two about the ownership of the lot in the last 12 months. No one spoke to me about it before the last 12 months that I remember of. Mr. Finley has spoken to me once about it, I believe, but not before 12 months ago. It might have been Mr. O'Hanlon spoke to me about it longer ago than that, but I don't think it has been longer than 12 months. Mr. Hollingsworth executed me a warranty deed to the lot. The first deed was executed some time during the summer of 1904. I haven't got that first deed that was executed. I do not know where it is. It got misplaced. I am positive that that deed was executed and delivered to me somewhere along about 1904, during that summer. It was after March 6th. That first deed was never placed of record. I don't know as I ever made a diligent search for the first deed until about a year ago or a little longer. I had a locker down in the county clerk's office that I kept some of my papers in, and I kept some of them out at the house. During the time I was collector I kept them down here in the office. I know from memory that there was a former deed executed by Mr. Hollingsworth to me to this lot 3, block 41. I had Mr. Hollingsworth to buy this in for me. Some time after that time Mrs. Carr put up some kind of a claim to the lot, and went to Mr. Hollingsworth about it, and he told me about it, and then I had him give me a deed. The agreement between Mr. Hollingsworth and me at the time he bought this in was that he was to execute a deed to me at any time that I would ask him for it. I paid taxes on this lot. I paid state and county and city taxes. (Witness is handed some papers.) These are tax receipts.

"Mr. Cox: We offer these receipts in evidence.

"The Witness: Some of the receipts show that I paid taxes on lot 4, block 41. That was caused by an error in rendition. I found out two or three years ago that there was an error in the rendition. As soon as I found out about it, I changed it from '4' to '3.' I didn't change the receipts. I changed the rendition. I first laid claim to the lot in 1904. I had been using it prior to that time. I used it for the purpose of rather a store place for things that I wasn't using. That is what I did with reference to claiming it. I asserted my claim of ownership by storing things on the lot. I took actual possession of it. I stored lumber on it and wire,

and lariated my horse and cow on it; put some machinery on it; put my wagon and buggies on it. I stated that I used it in that way. I used it that way to the exclusion of others. I had possession of it. I first asserted that possession about 1897 or 1898. I first started to using and occupying the place about that time, about 1897 or 1898; somewhere along there. No one else used or occupied that lot from then on. During that time no other person ever occupied the lot."

Cross-examination by Mr. Finley:

"I made inquiries of several about the ownership of that lot. I don't know but what I asked you (Mr. Finley) about it one time down in the county courtroom or in the county clerk's office. And I asked Mr. Tuck. I don't remember that you turned to the books and showed me whose name it stood in. I have asked Mr. Tuck. I have talked about it frequently. I don't know who that first deed was acknowledged before, only just from the party that did my notary work usually. I did not go to the notaries and have them examine the books and see if there had been any acknowledgment made. I didn't make any such effort to find out whether there had been a deed acknowledged or not. I don't know as a matter of fact that there never was one executed until this last one. I know that there was. I got up this other instrument in 1914 because I couldn't find my other deed. I don't think I knew the date of the other one. I fixed the date of this instrument from recollection and memory. I didn't go to the notaries that did work to find out whether or not there was a record. I don't know that the law requires notaries to keep a record of those acknowledgments, public documents. It is not a fact that the reason I didn't go to them was because there never was one executed back there. I think it was three years ago this coming spring that I fenced this lot. I think it is a little bit short of three years now. Prior to that time I lariated my stock on the lot. I lariated calves on it and milch cows and a horse and colt. I did that during the spring, summer, and fall. I didn't do it through the winter. I may have put something out there in the late fall for exercise. I don't know. I don't mean to say that I didn't or did. I put lumber on it. I didn't run as large a lumber yard as they run here in town. Oftentimes I would buy lumber to repair things around the place, or probably secondhand lumber, generally. I didn't buy any new lumber and store it out there. I would sometimes leave my buggy standing on the property and sometimes my wagon or machinery. The machinery didn't stay there from year to year. I didn't keep it there all the time. I don't remember when I first put lumber there; I couldn't give you the date. To come right down to it, I expect there has been some lumber there all the time; some lumber or wire that has been rolled up, or something of the kind. * * *

"In tying my animals there I tied them at different places. The lot is inclosed now. Prior to the time I put the fence there a little less than three years ago there was no inclosure, and never had been so far as I know from the time I moved out there. There are no buildings on it. It was an open lot, except that it was fenced on two sides, north and south sides. That left the east and west ends open. It wasn't fenced at all until the men north and south fenced their lots. It is not a fact that I put the first fence on the south there. My recollection is there was a fence on the north and south and this house burned. There was a house on the north side of the lot. That wasn't before I moved out there. It burned by back fence down and barn. There was no fence across either end of the lot, and other people had the same access to it if they wanted it, and hitched their cattle there if they wanted to. I don't know whether Mr. O'Hanlon put up a sign there on that lot or not some years ago. I know there is a sign

there, but I don't know who put it there. I didn't see him. It has his name on it. I think it has been two or three or four years ago that that was put there. I don't know how long. I didn't pay much attention to it. I don't think it was five or six years ago."

The testimony in this case shows that vacant lots in the city of Sherman are frequently used by the residents for lariating out their cows or stock upon them to graze, and the very lot in question was used by appellee and others when he did not claim to own or have a right thereto. The appellee did not pay the taxes on this lot until about 1910, or 1911. This was caused by an error on his part in supposing that lot 3 was lot 4, and he paid on lot 4.

Assignments of error are based on the admission of the testimony to the effect it did not show possession exclusive and continuous and to the refusal of the court to instruct a verdict for appellant and to grant a new trial, all asserting the insufficiency of the testimony to support the three and ten year statute of limitation.

[1-3] We think the trial court should have instructed the jury, as requested by the third specially requested charge, to the effect that there was no testimony to support the three-year statute of limitation. A void deed does not constitute "title or color of title" required by the statute to support the three years. A tax deed does not constitute title unless the authority of the maker of the deed is shown by proof of performance of all the preceding requisites. Latimer v. Logwood, 27 S. W. 960; Telfener v. Dillard, 70 Tex. 139, 7 S. W. 847; Gillaspie v. Murray, 27 Tex. Civ. App. 580, 66 S. W. 252; Allen v. Courtney, 24 Tex. Civ. App. 86, 58 S. W. 200. The deed of a tax collector, without proof of compliance with the requirements of the law conferring authority to make the sale, is no evidence of title in the party claiming under it. This is not an open question in this state. Clayton v. Rehm, 67 Tex. 52, 2 S. W. 45, and authorities cited; Dawson v. Ward, 71 Tex. 72, 9 S. W. 106. The deed was properly introduced in evidence on the question of limitation, but in order to prescribe, under the three-year statute, it must show title or color of title, and this is not shown, under the authorities of this state, until the necessary precedent requirements of the law are shown, authorizing its execution. There was no title shown under the three-year statute.

"Adverse possession is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another." Art. 5681, R. C. S. Under the testimony of Morrison, no "claim of right" was set up until 1904. Previous thereto he was looking for the owner and making inquiries for him. His use of the lot up to that time was not "inconsistent with and hostile to" the owner. Just at what time Morrison's

acts were sufficient to notify the owner that he was using the lot no longer as the property of the owner, but under a "claim of right," is difficult to determine from the evidence. The tax deed was not to himself. There was nothing of record to show a claim set up by him. In so far as external circumstances show, he was then, as he had been previously, a mere casual trespasser, or on the lot by permission of the owner. He paid no taxes on this lot, but he says he intended to, but by mistake paid on lot 4, a lot immediately back of him. So far as this record shows, appellee never notified any one he claimed this lot until a year or so before he fenced it, about the time a Mr. Brown built on lot 4, when he thought lot 4 was the one he bought at the city tax sale. He thought 4 occupied the position in the block that 3 occupied. This lot was not only used by appellee to tie his stock on to graze, but was used by others for the same purpose. This was a permissive user by the owner, and was not under a claim adverse to the owner at the inception of the entry. This permission may be presumed we think.

"So long as the possessor declares that he holds in subordination to the better title, the possession will be regarded as held by consent; nor will a continued possession after such declaration avail to mature title under the statute of limitation until the party has changed the character of his possession, either by express declaration or by the acts of ownership inconsistent with a subordinate character." Satterwhite v. Rosser, 61 Tex. 166; Chance v. Branch, 58 Tex. 490; Buford v. Wasson, 49 Tex. Civ. App. 454, 109 S. W. 275; Meurin v. Kopplin, 100 S. W. 984; Surghenor v. Taliaferro, 98 S. W. 648.

"It follows, therefore, that where the possession of the claimant was in its inception taken with permission of the owner and in subordination to his title, it cannot become adverse without a distinct and open disavowal of the title of the owner brought home to the owner." Corpus Juris, vol. 2, page 124, § 210, and authorities above cited.

When the appellee changed his acknowledged recognition of the rights of the owner, there was no act on his part or thing done on the land different to that previously done. The deed was not in his name, and notice was not given of his claim under it. The whole matter was kept secret from the owner.

"His claim, so far as the evidence discloses, was a mere mental process, known only to himself. There was no 'external circumstances discovering that inward intention.' It would seem that when one proposes to hold the land of another, which he has neither occupied nor inclosed, by virtue of the statute of limitations it should appear that he has exercised some act of ownership over some definite part thereof calculated to apprise the owner that he is asserting 'a claim of right.'" Titel v. Garland, 99 Tex. 201, 87 S. W. 1152.

[4] Appellee's claim of right was under a tax deed from the city, dated March 1, 1904, and until this deed appellee asserted no right to the lot. He asserted no other claim. This suit was filed August 27, 1914. The appellee, in his brief, cites section 116 of the

charter of the city of Sherman, passed by the Twenty-Fourth Legislature, 1895, page 61, to the effect that the owner shall have the right to redeem his real estate sold for taxes at any time within two years. Deducting the time allowed for redemption after such claim under the deed, the period of time before filing of the suit would be less than ten years. Assuming that the purchase was sufficient notice to the owner of an adverse claim under the tax deed, he had only such notice of the claim as the deed would authorize or the law would permit. It gave notice under what claim possession was held by appellee. It has been established in this state that possession under a tax deed is not adverse to the title of the owner until after the period of redemption expired. The tax deed cannot be used as a basis for possession under the statute of limitation until after the period for redemption. Davis v. Hurst, 14 S. W. 610; Beatty v. O'Harrow, 49 Tex. Civ. App. 404, 109 S. W. 414; Bledsoe v. Haney, 57 Tex. Civ. App. 285, 122 S. W. 455; Porter v. Brooks, 170 S. W. 103; Davis v. Howe, 176 S. W. 759 (writ of error was granted in the last case but evidently not on this question); Turner v. Smith, 56 Tex. Civ. App. 1, 119 S. W. 922; Bente v. Sullivan, 52 Tex. Civ. App. 454, 115 S. W. 350; Masterson v. State, 17 Tex. Civ. App. 91, 42 S. W. 1003.

The authorities above cited were cases under the five-year statute, where the purchaser at tax sale relied upon a duly registered tax deed for five years, but we see no reason why one in possession under a claim of title through a tax deed should not be governed by the same principle under the ten-year statute. Adverse possession under a claim of title is the same in both instances. Where one claims title through the owner, by virtue of a tax deed, adverse possession is the same, and until after the period of redemption the deed under the law confers no right of possession in the purchaser, but the right of possession under the deed is in the owner. One so holding land under the deed must therefore recognize the right of the owner, and hence there is no adverse possession "inconsistent with and hostile to" the owner. We, therefore, think during the two years which appellant had the right to redeem appellee's possession could not be said to be adverse or hostile or inconsistent with the rights of appellant. The "actual, visible appropriation" was not such under the facts of this case, in our judgment, and of "such a character as to indicate unmistakably an assertion of claim of exclusive ownership in the occupant." Mhoon v. Cain, 77 Tex. 316, 14 S. W. 24; Richards v. Smith, 67 Tex. 610, 4 S. W. 571; Gillespie v. Jones, 26 Tex. 346; Bender v. Brooks, 103 Tex. 329, 127 S. W. 168, Ann. Cas. 1913A, 559; Raley v. Sullivan, 159 S. W. 99.

[5] Neither do we think the facts sufficient to show a "continuous" or exclusive use of the property. Pendleton v. Snyder, 5 Tex. Civ. App. 427, 24 S. W. 363. It has been repeatedly held in this state that going upon land and cutting timber and the like is not alone evidence sufficient to show adverse holding under a claim of right (Sellman v. Hardin, 58 Tex. 86; Murphy v. Welder, 58 Tex. 235; Soape v. Doss, 18 Tex. Civ. App. 649, 45 S. W. 387; Perry v. Stevens, 44 Tex. Civ. App. 108, 97 S. W. 1075), or the grazing of stock on the land (De Las Fuentes v. McDonald, 85 Tex. 132, 20 S. W. 43; Haynes v. Ry. Co., 51 Tex. Civ. App. 49, 111 S. W. 427).

[6] To constitute adverse possession the party occupying the land must appropriate it to some purpose, for which it is adapted. Mere occupancy of land, without evidence showing an intention to appropriate it, will not support the statute. Nona Mills Co. v. Wright, 101 Tex. 14, 102 S. W. 1118.

It is urged by appellee in this case, because the cattle were tied on the land to graze, that this will evidence an appropriation; that it is distinguishable from that class of cases where cattle are herded on land or held on land for grazing purposes. The evidence shows in this case they were only kept on the land during the grass season. In the winter and the months when there was no grass, the cattle were not held or tied on the lot. Others used the land for the same purpose as did appellee, and no attempt is shown on the part of appellee to exclude others so using the land. This, from the evidence, appears to have been the custom over that city; that is, to tie cattle upon vacant lots to graze, whether the lot was owned by the one so grazing. It was what the appellee did on this lot for more than seven years before he made any pretense of claim to it. He placed his buggy, wagon, and mower on the lot; piled some lumber on it. He does not pretend to say how much or what part of the lot was used. It is shown by other evidence in the case that there was a black locust tree across the alley from the lot on which appellee resided, near the line of the lot in question, and that he used this as a shade for his buggy and horse. Mr. Brown, who purchased lot 4, testified there was some lumber on the line of his lot and 3 when he purchased it. It occurs to us these acts of the appellee are too casual, not of sufficient continuity, and are shown to be such as are usual by the people of that city and by the appellee, when he asserted no claim to the lot. They are not of a character sufficient to notify the true owner of an intent to hold the property adverse to him. Guinn v. Sumpter Valley Ry. Co., 63 Or. 368, 127 Pac. 987.

We do not believe the evidence sufficient to support the verdict of three and ten years, and most assuredly not of five years.

The case will be reversed and remanded.