MANNING et al. v. STANDARD OIL CO. OF KANSAS et al.

No. 2501.

Court of Civil Appeals of Texas. Beaumont. Jan. 18, 1934.

Rehearing Denied Jan. 31, 1934.

Hill, Hill, Randolph & Hughes, of Houston, M. E. Gates, of Huntsville, and C. O. Marsh, of Conroe, for appellants.

R. E. Seagler, John C. Townes, Jr., Jeff D. Farish, F. J. Winter, Harry Holmes, and Vinson, Elkins, Sweeton & Weems, all of Houston, and Prentice Wilson, of Dallas, for appellees.

WALKER, Chief Justice.

This was an action in trespass to try title by appellants, Mrs. Leana M. Manning et al., against appellees, whereby they sought to recover an undivided interest of 160 acres out of a tract of 826 acres, part of the Ransom House survey in Montgomery county. Appellees owned the record title to the land in controversy and appellants' claim was based upon the ten-year statute of limitation. Judgment was for appellees upon the verdict of the jury finding against appellants' claim of limitation.

Appellants pray that the judgment of the lower court be reversed and judgment here rendered in their favor upon the theory that, under all the evidence, they established a title under the statute of limitation of ten years (Rev. St. 1925, art. 5510).

Their first contention is that W. A. Wiggins took possession of this land in 1893 and remained in possession until 1911, thereby perfecting the limitation title, and that by written transfer they hold the Wiggins title. The facts under this contention are as follows. In 1893 Wiggins bought the Tom Travathan pre-emption survey of 43 acres which adjoins the Ransom House survey on the south. He took immediate possession and began at once improving the Travathan land. In making his improvements in 1893, he included a portion of the Ransom House survey immediately north of his land and continued this possession until 1911. Appellants' testimony was to the effect that the improvements on the House survey were separate from the improvements on the Travathan survey; that the two improvements were separated by a lane; that as much as 20 acres of land was under fence on the Ransom House and several acres were cleared and in cultivation. The testimony of appellees was to the effect that the land on both surveys was under the same fence; that at first 1 or 2 acres on the House was inclosed, but by 1911 the fences were extended to include 6 or 8 acres. All the principal improvements used by Wiggins were on the Travathan survey—the dwelling house,

the barn, the well, etc. During the time he lived upon the Travathan, Wiggins rendered it for taxes but never made any rendition or paid any taxes on the Ransom House. On the 20th day of August, 1904, Wiggins, for the purpose of showing possession of the Travathan, made affidavit that he did not have a homestead on any other land. John Reel, who bought the Travathan from Wiggins in 1911, testified that he knew Wiggins before he bought this land; that he bought only the Travathan and bought no claim on the Ransom House and did not agree with Wiggins to hold for him any portion of the Ransom House, but that after selling him the Travathan, Wiggins moved away and was not subsequently in possession of any land on either survey. We quote as follows from the testimony of this witness:

"Q. During the time that Will Wiggins was living on the Travathan Survey, did he ever tell you, or did you ever hear him say who the Ransom House Survey to the north belonged to? A. Yes, sir.

"Q. Who did he tell you it belonged to? A. He said it was Conroes'.

"Q. It belonged to Conroe? A. Yes, sir.

"Q. That was before he left in 1911? A. Yes, sir.

"Q. I said Will Wiggins, that is W. A. Wiggins? A. Yes, sir.

"Q. They are one and the same person? A. Yes, sir.

"Q. You say he told you that that land there north of the Travathan belonged to Conroe? A. Yes, sir. Something was said one time, and he told me that was the Conroe land, and so far as anything being mentioned about it, when we traded, I don't remember it."

On cross-examination this witness testified that it was not customary in that country for people to tell other people what they claimed; it was not customary to take those things; that he never heard the Conroes nor the Madeleys nor the Whitleys claiming this land; that he just knew it as the Conroe land; "was that what Wiggins told you in discussing it that that was the Conroe land? A. Yes, sir."

On the statement made, two issues were raised against the theory that Mr. Wiggins had perfected a title by limitation to the land sued for; (a) that his possession was not adverse, and (b) that his possession was a mere encroachment. That Wiggins rendered and paid taxes on the Travathan land but did not render or pay taxes on the Ransom House was evidentiary on the issue of limitation. In Harris v. Wagnon (Tex. Civ. App.) 148 S. W. 606, 607, the court said:

"Appellants plainly had a right to have the jury in determining the question to consider the fact that said E. H. Jones had never during the time it was claimed he was asserting adverse possession of the land in controversy paid taxes thereon. Webb v. Lyerla, 43 Tex. Civ. App. 124, 94 S. W. 1096; Abbott's Trial Evidence, pp. 905, 906."

On the same principle of law the affidavit made by Wiggins in proof of his occupancy of the Travathan was a circumstance against his limitation claim. Also, the fact that Wiggins abandoned his possession in 1911, under appellees' theory of the case, and asserted no adverse claim until 1932, when he executed his deed to appellants was an additional circumstance of evidentiary force. In 2 C. J. 273 it is said: "Evidence of an abandonment of the possession after the lapse of the period of limitation is admissible to show that the possession was not hostile, but such evidence is not conclusive as to the hostility of the prior possession."

The testimony of John Reel that Wiggins told him that the land on the Ransom House "belonged to" the Conroes, who held the record title, was evidence of great weight on the issue of Wiggins' limitation title. Odem v. Lehy (Tex. Civ. App.) 264 S. W. 218; Texas & N. O. R. Co. v. Speights, 94 Tex. 350, 60 S. W. 659; Houston Oil Co. v. Pullen (Tex. Com. App.) 272 S. W. 439; Nerio v. Christen (Tex. Civ. App.) 189 S. W. 1038, 1039; Boone v. City of Stephenville (Tex. Civ. App.) 37 S.W.(2d) 842; Beal v. Earhart (Tex. Civ. App.) 249 S. W. 1093; Whitaker v. Thayer, 38 Tex. Civ. App. 537, 86 S. W. 364; Mhoon v. Cain, 77 Tex. 316, 14 S. W. 24. The issue of adverse possession is essentially a question of fact, which depends upon the intention of the limitation claimant in holding, using, occupying, and enjoying the disputed premises. City of Abilene v. Reed (Tex. Civ. App.) 294 S. W. 913, 914; Word v. Drouthett, 44 Tex. 365. Under the authorities cited above, the circumstances enumerated were sufficient to carry to the jury the issues of Wiggins' limitation claim.

We think the following authorities support the contention of appellees that the evidence in this case raised the issue that Wiggins' possession was nothing more than an encroach-

ment: Bailey v. Kirby Lmbr. Co. (Tex. Civ. App.) 195 S. W. 221; Holland v. Nance, 102 Tex. 177, 114 S. W. 346; Bender v. Brooks, 103 Tex. 329, 127 S. W. 168; Temple Lmbr. Co. v. Low (Tex. Com. App.) 272 S. W. 769; Fielder v. Houston Oil Co. (Tex. Com. App.) 210 S. W. 797.

The court correctly refused to render judgment for appellants for that portion of the Ransom House held by Wiggins under his inclosures. This follows for two reasons. First, the evidence raised the issue that the use and occupancy of this land was not adverse to the record owners. Second, on the theory of encroachment appellants failed to identify upon the ground the land held by Wiggins under his inclosures. Furlow v. Kirby Lmbr. Co. (Tex. Civ. App.) 53 S.W.(2d) 642, and authorities therein cited; Cunningham v. Settegast (Tex. Civ. App.) 24 S.W.(2d) 520, 523.

We have discussed the Wiggins limitation claim on the theory that it was available to appellants under their deed from Wiggins. Appellees urgently insist that appellants are not in position to claim through this deed. However, because the verdict of the jury clearly has support, we pretermit a discussion of appellees' counterproposition.

Appellants' second theory of limitation is under the possession of Ed Manning, who bought the Travathan from Reel and took possession in 1912. The following statement from the evidence shows that the character of this possession was a fact issue for the jury. John Young testified that he moved on the Travathan survey in 1921 and lived there seven years; that Ed Manning, who bought from Reel and through whom appellants hold, talked to him several times about the lines of the Travathan and Ransom House and told him that he knew the land on the Ransom House was Madeley's and that Madeley might some time want him to take away his fence, and Madeley had told him to go ahead and cultivate the land on the Ransom House the same as he did the balance of his land; that he had turned the place back to Madeley and that the witness would have to make a trade with the Madeleys for the future renting of the land; after this conversation witness made arrangements with Mr. Madeley to rent the Travathan land and also the land on the Ransom House, and he paid Mr. Madeley rent for the use of the land on both surveys. J. W. Brown testified that he had lived within the vicinity of the Travathan and Ransom House surveys for about forty years and was well acquainted with the dividing line between these two surveys; that during the time Manning was living on the Travathan he stated to Manning that he was going to cut a board tree on the Madeley land on the Ransom House survey and that Manning told him he could not cut the tree as he, Manning, had charge of Madeley's timber to keep any one from cutting it. R. M. Dueitt testified that Ed Manning said to him:

" 'Mr. Dueitt, I own 43.3 acres here', he says, 'is all the land I own now', he says, 'on the north side of my field here', he says, 'Dan Madeley and Albert have got a strip of land on the inside of my field here and I am cultivating it to look after the timber on the Ransom House to keep people from cutting it', he says, 'it don't belong to me, I just want to show it to you so if we trade you would know that Dan Madeley and Albert have a strip of land in here.' "

Under the authorities cited above these admissions by Manning were sufficient to make the nature of his possession a jury question.

There is no merit in appellants' contention that when the jury retired to consider its verdict, it was guilty of misconduct in "that before considering the issues submitted to it by the court, the jury decided by a vote of the jury to return their answers to the special issues so that their verdict should result in a judgment in favor of the Madeleys, defendants in this cause, and that thereafter they framed their answers to the special issues in the case so as to carry said agreement to find in favor of the Madeleys into effect, without regard to the special issues submitted by the court, and did not in fact consider the special issues at all." The testimony of three of the jurors on motion for new trial probably supports this contention. But the testimony of the other jurors was affirmatively to the effect that the verdict was not arrived at in the manner charged by this proposition. They testified that the foreman read the charge to the jury, which consisted of three special issues, and that as the issues were read they were voted on and the answers returned with the consent and approval of all the jurors. The court was the judge of the credibility of the jurors who testified as witnesses, and by overruling the motion for new trial he found in favor of appellees that the jury was not guilty of misconduct. Texas & P. Railway Co. v. Aaron (Tex. Civ. App.) 19 S.W.(2d) 930; Galveston Electric Co. v. Biggs (Tex. Civ. App.) 14 S.W.(2d) 307; St. Louis, B. & M. Railway Co. v. Cole (Tex. Com. App.) 14 S.W. (2d) 1024; Harwell v. Reed (Tex. Civ. App.) 50 S.W.(2d) 415; Bradshaw v. Abrams (Tex.

Com. App.) 24 S.W.(2d) 372; Lackey v. Southland Greyhound Lines (Tex. Civ. App.) 35 S. W.(2d) 739; Davidson v. Swanson (Tex. Civ. App.) 43 S.W.(2d) 172.

 We overrule appellants' contention that "while the jury was considering their verdict the deputy sheriff remained with said jury throughout their deliberations and made communications to said jury in violation of the law, the effect of which was to render the verdict of the jury void." The only statement made by appellants under this proposition is as follows: "The deputy sheriff, Cecil Baulwire, had charge of the jury and slept with them the night after the charge of the court was submitted to them and before their verdict was returned."

The record further shows that the case was not mentioned by any of the jurors nor by the deputy sheriff in any way nor for any purpose during the night the deputy sheriff had them in charge and during the period of time covered by appellants' proposition. This act of the deputy sheriff was in no way prejudicial to the interest of appellants and, therefore, not erroneous.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

### On Rehearing.

We have given careful consideration to the motion for rehearing and for additional fact conclusions and argument in support thereof, but find no new point advanced by appellants.

 We refuse the motion for additional fact conclusions because the requested findings go only to the point that appellants raised the issues of limitation by the evidence introduced by them sufficient to send the case to the jury. But it must be borne in mind that appellants lost their case before the jury and in affirming the judgment of the lower court, based on the verdict, it is necessary—we should probably say proper—to show only that the verdict has reasonable support in the evidence. To make a further statement of the facts, as appellants now request, would only needlessly extend the opinion.

On the issue of encroachment we agree with appellants' contention that by their pleadings they sufficiently identified their inclosures. But that alone was not sufficient to support their claim. The evidence was sharply conflicting as to the location and extent of the inclosed land and in view of that fact, to recover the inclosures it was necessary for appellants to have a jury finding upon this conflicting testimony.

 Appellants ask us to reverse and remand the case to enable them to develop more fully their theory of the facts, citing in support of this proposition Vergara v. Myers, 239 S. W. 942, by the Supreme Court, speaking through Judge Cureton. As we understand the rulings of our courts it is never proper to reverse a judgment rendered in favor of the appellee merely that appellant may have a second chance to prove his case. Where one loses his case before a jury because of insufficient evidence, he has no right to a second trial based upon the proposition that if given another chance he could strengthen his case before the jury.

All points of law raised in the motion for rehearing are disposed of to our satisfaction in the original opinion. It follows that the motion for rehearing should be overruled and it is accordingly so ordered.