**WIGGINS et al. v. HOUSTON OIL CO. OF TEXAS et al.**

No. 4397.

Court of Civil Appeals of Texas. Beaumont.

May 15, 1947.

Rehearing Denied June 4, 1947.

160 acres of land in the Augustus Wagner 320 acre survey in Tyler county. Appellants are the successors in interest of John Buck Wiggins and wife, Elizabeth Wiggins. Excepting certain formal parties, they are the surviving children of John Buck Wiggins and wife, together with the heirs of Monroe Wiggins, a son of the said Wiggins and wife. Appellees are Houston Oil Company of Texas, Southwestern Settlement & Development Corporation and Republic Production Company.

Under the formal allegations in trespass to try title appellants plead fee title in themselves to a specific 160 acres of land in the northeast corner of the Wagner survey. They also alleged title under the ten year statute of limitations to this specific 160 acres, and in the alternative, to an undefined 160 acres, to be located and set aside to them as the ten year statute provides. Appellees' pleadings include a plea of not guilty and pleas of title to the land under the three-year statute of limitations and under Article 5519a, Vernon's Ann.Civ.St.

Appellants will be referred to hereinafter as plaintiffs, and appellees as defendants, as they were in the trial court.

Pending suit, Lee H. Wiggins, one of the plaintiffs, conveyed his interest in the specific 160 acres to his brother and coplaintiff, Jimmie Wiggins, although not in the Wagner survey as a whole, and he also filed a disclaimer; and on this cause coming to trial, and certain objections being made to the competency of testimony which plaintiffs sought to adduce from him, he also took a nonsuit, we infer that Monroe Wiggins was one of the original plaintiffs and that his heirs were substituted in his stead, upon his death.

The cause was tried to a jury, but at the conclusion of the testimony the trial court instructed a verdict in defendants' behalf, upon their motion so to do, and rendered judgment that plaintiffs take nothing, either in the specific 160 acres or in the Wagner survey as a whole. Plaintiffs have appealed.

On trial, plaintiffs asserted only a limitation title based upon the 160 acres provision of Article 5510, R.S.1925. Their title

Grover C. Lowe, of Woodville, and John Lindsey, of Pt. Arthur, for appellants.

Blades, Chiles, Moore & Kennerly, of Houston (B. F. Whitworth, of Houston, of counsel), for appellees.

WALKER, Justice.

Appellants brought this action against appellees in trespass to try title to recover

depends upon the possession of John Buck Wiggins as a naked trespasser. They offered evidence to show that from 1893 until John Buck Wiggins' death in 1905, the said Wiggins had adverse possession of a small field containing some 8 or 10 acres, known as the Ladd field, which was located upon the Wagner survey, apparently in the northeast part of that survey, and that during this period Wiggins claimed 160 acres of land. John Buck Wiggins died on November 5, 1905, or perhaps on October 6, 1905. Plaintiffs also offered some evidence to show that during 1906 and 1907 this field was cultivated by two of John Buck Wiggins' sons, namely, Lee H. Wiggins and Monroe Wiggins, to whom we have referred above. All of the Wiggins children seem to have been minors at this time, residing with their mother, Elizabeth Wiggins. Mrs. Wiggins died on July 3, 1916. The evidence shows without dispute that about 1907 or 1908 Mrs. Wiggins and her children moved away from the community in which the Wagner survey is located and that afterwards, prior to the filing of this suit on March 1, 1940, none of them made any use of, or held possession of the Ladd field, or of any part of the Wagner survey, and that with the possible exception of Lee H. Wiggins, who testified to certain hunting and fishing trips, none of them have been upon the Wagner survey or done any act evidencing any claim whatsoever to land in that survey. None of these people paid taxes on the land after John Buck Wiggins' death and there is no proof that Wiggins himself ever paid taxes on this land.

Defendants hold the record title to the Wagner survey. In addition to their proof of record title, they attempted to establish title under the three year statute of limitations and under Article 5519a. They also offered evidence disputing plaintiffs' theory of the facts respecting John Buck Wiggins' occupancy of the land in suit.

Plaintiffs' points of error attack, and defendants' counter points affirm the instruction of a verdict and thereby raise three questions, on which our disposition of this appeal depends, namely: (1) whether there is any substantial evidence in this record tending to support the limitation title claimed by plaintiffs, either to a specific or to an undefined 160 acres, (2) whether defendants proved title in themselves under the three year statute of limitations, and (3) whether defendants proved a title in themselves, as a matter of law, under the provisions of Article 5519a.

■ I. Is there evidence of limitation title in favor of plaintiffs? Defendants say that plaintiffs' proof locates the residence, possession and claim of John Buck Wiggins and family upon land north of the Wagner, during the limitation period, to-wit, upon Section 14, East Texas Railway Company Survey, and that plaintiffs therefore failed to show title to land in the Wagner survey. We are inclined to agree that plaintiffs have put the Wiggins residence (that is, the residence they claimed for Wiggins during the limitation period) upon section 14. There are various circumstances in the record, but the most striking are Lee H. Wiggins' repeated statements locating this residence on section 14 and confirming the substance of B. C. Barclay's testimony that in 1940 the said Lee H. Wiggins pointed out to him the site of a former residence of John Buck Wiggins, which was located on section 14. However, this matter does not control our judgment, for the evidence referred to below tends to show that the Ladd field was a separate tract held under a separate possession, that it was situated upon the Wagner survey, and that John Buck Wiggins held it under adverse possession for 10 years or longer, cultivating it annually under a claim extending to 160 acres. We will state briefly the basis for our conclusions.

(A) The Wagner survey was patented to Augustus Wagner on April 16, 1852. It takes the form of a square containing 320 acres, of which each boundary is 1344 varas long. The north boundary runs due east and west, and the eastern boundary runs due north and south. Adjoining the Wagner on the north and east is section 14, East Texas Railway Company survey; the north and east lines of the Wagner also constitute boundaries of section 14. Apparently the western line of section 14 runs north from the Wagner northwest corner.

The specific 160 acres sued for by plaintiffs is in the form of a square, each side

of which is 950 varas long. This tract is located in the northeast part of the Wagner survey; the northeast corner of the Wagner and of the 160 acres is a common point, and the northern and eastern boundaries of the 160 acres lie upon the northern and eastern boundaries of the Wagner.

Several streams flow through these various tracts which tend in some degree to fix the location of the Ladd field and of the John Buck Wiggins residence, but we need only refer to one, namely, Kimball creek. This stream crosses the Wagner survey from west to east and runs through the southern part ("on the south line") of the specific 160 acres in suit.

B. C. Barclay, a surveyor of 35 years experience, went upon the Wagner survey in February, 1940, in company with Lee H. Wiggins, and located and viewed the specific 160 acres sued for by plaintiffs. He said that he found the remains of an old field covering 6 or 8 acres in the northeast corner of the Wagner, about 300 varas south of the Wagner north line and about 300 varas west of the Wagner east line, and further, that this field was north of Kimball creek. The jury could infer that this was the only evidence of cultivation he saw upon the 160 acres. He saw no evidence of any dwelling upon this 160 acres, nor had he ever seen such evidence upon the Wagner survey, and he testified that he had been upon the Wagner survey many times.

He said that this field on the Wagner lay south of the residence site on section 14 which Lee H. Wiggins had designated as a former John Buck Wiggins residence.

There is other testimony, the details of which are referred to below, tending to prove that the John Buck Wiggins residence lay apart from the Ladd field, and that this field lay south of the residence, although we note that Dowden said: "The little old field was back, I would call it, kind of a southwest course from the house."

Lee H. Wiggins made several statements which tend to show that the Ladd field was on the Wagner survey.

During his first examination, he testified that Ladd showed him the northeast corner of the Wagner survey. "Q. Who is Mr. Ladd? A. A farmer on that place." (Obviously a farmer on the Wagner survey.) "Q. Is that the man your father succeeded him there? (That is, succeeded Ladd in occupancy of the farm on the Wagner.) A. Yes, sir."

During his third examination, Lee H. Wiggins testified at length about the cultivation and extension of the Ladd field and the removal of timber therefrom, and about the cutting of timber and making of ties upon a 160 acre tract which we take to be the specific 160 acres in suit, and upon a 160 acre tract which the witness said John Buck Wiggins "stepped off", beginning at the Wagner northeast corner. He referred first to one and then to another of these tracts, without discrimination. This testimony is certainly indefinite to some extent respecting the location of the Ladd field and of the "stepped off" 160 acres; but on a construction of it as a whole, the jury could have inferred that this witness, and the counsel examining him, had only one tract in mind, which included the cultivated land, namely, the Ladd field. This testimony at least raises an inference that the field was upon the 160 acres which John Buck Wiggins "stepped off", and this 160 acres is fixed upon the Wagner by the following testimony referring to Kimball creek: "Q. Does it (the witness is referring to the 'stepped off' 160 acres) have a general slope toward Kimball creek? A. Yes, sir. Q. What direction would that be toward the field? A. It (obviously, the creek) would be the south part of the portion of 160 acres; south." Barclay, as previously stated, put Kimball creek on the southern part ("on the south line") of the specific 160 acres in suit. If this "stepped off" 160 acres began at the Wagner northeast corner, and if Kimball creek ran through the southern part of it as this witness says, the jury could infer that the 160 acres was at least substantially confined to the Wagner survey.

■ Under all of these circumstances, it was an issue for the jury whether the land cultivated by John Buck Wiggins lay on the Wagner survey and upon the specific 160 acres in suit.

(B) The jury could infer that the Ladd field was held under a separate possession.

This tends to follow if we say that the Wiggins residence was on section 14 and the Ladd field was on the Wagner survey, but there are confirming circumstances. Barclay separated the old Wiggins "house place" and the old field he found, by putting the two sites on different surveys and the old field a substantial distance from the Wagner north line. J. S. Dowden did not know how far the Ladd field was from the John Buck Wiggins house, but leaves the impression that the field and the house were separated. He said: "The little old field was back, I would call it, kind of southwest course from the house." M. F. McCormick put John Buck Wiggins in a house on the Hyatt tram, and said that there was a small field, with certain improvements on it, located one-half mile to the south, which John Buck Wiggins cultivated and called his home place during a period beginning about 1893 and extending up into 1900, when the witness left that area. The witness understood John Buck Wiggins to be preempting a home on this cultivated land. Sam Overstreet put the Ladd field south of this house on the tram, or at least the jury could so interpret his testimony, and the jury could infer that the Ladd field to which Overstreet referred was the site which McCormick said that John Buck Wiggins was cultivating, especially when Overstreet's testimony locating the Ladd field is considered with other evidence showing that John Buck Wiggins did cultivate and claim a field known to the witnesses as the Ladd field, from 1893 until his death in 1905. There is no evidence before us that there was more than one Ladd field.

■ There was evidence from Lee H. Wiggins and from various other witnesses tending to show that John Buck Wiggins cultivated the Ladd field annually during a period beginning in or about 1893 and continuing until Wiggins' death in 1905, growing corn, cotton, peas and sweet potatoes, and that during 1906 and 1907 two of his sons, namely, Lee H. Wiggins and Monroe Wiggins, cultivated this field. At this time these boys were residing with their mother, who was evidently the head of the family. There is also testimony tending to show that John Buck Wiggins extended the Ladd field some two or three acres and that during his occupancy this field was wholly or partially enclosed. Such annual cultivation, without residence upon the land, is sufficient possession under the 10 year statute. Dunn v. Taylor, 102 Tex. 80, 113 S. W. 265, page 268: "It is doubtless true that the uses to which land is put may be considered, in determining whether or not intervals between the occupancy of tenants were only such as may be considered as the time reasonably required for the change. When yearly crops are raised, it may be that actual occupancy of a tenant for the time between the harvesting of one crop and the preparation for another should not be held to be essential. In such cases the appearances on the land itself would probably show the purposes for which it is being used." Stevenson v. Barrow, Tex.Civ.App., 285 S.W. 840; Id., Tex.Com. App., 291 S.W. 1101; Id., Tex.Civ.App., 5 S.W.2d 200; Stephenson v. Barrow, Tex. Com.App., 15 S.W.2d 575; Hoover v. Mc-Farland, Tex.Civ.App., 27 S.W.2d 568; Hardy v. Bumpstead, Tex.Com.App., 41 S.W.2d 226, 76 A.L.R. 1488.

■ There is testimony from various witnesses tending to show that John Buck Wiggins claimed the tract he cultivated, and some testimony from Lee H. Wiggins that his father claimed 160 acres, including this field. There was evidence that the specific 160 acres represented an equitable division of the Wagner survey; and under their alternative pleading setting up title to an undefined 160 acres, to be set aside to them as the 10 year statute provides, plaintiffs could recover an undefined 160 acres and on a partition of the survey, the specific 160 acres for which they sued, even if it be said that they failed to show adverse possession of that specific 160 acres during the limitation period. Louisiana & Texas Lbr. Co. v. Kennedy, Tex.Civ. App., 142 S.W. 989, page 991, head note 3; Louisiana & Texas Lbr. Co. v. Stewart, 61 Tex.Civ.App. 255, 130 S.W. 199, page 203; Wells v. W. T. Carter & Bro., Tex.Civ. App., 78 S.W.2d 678, affirmed Tex.Com. App., 106 S.W.2d 1050, 115 A.L.R. 1293; Houston Oil Co. v. McGrew, Tex.Civ.App., 143 S.W. 191; Davis v. Collins, Tex.Civ. App., 169 S.W. 1128.

■ It was not proven as a matter of law that John Buck Wiggins was attempting to preempt 160 acres on section 14 under the former homestead laws. The letter of June 1, 1900, which he wrote to the Land Office indicates that he was, but this letter did not constitute a judicial admission. At most, it was a circumstance in defendants' favor. See Manning v. Standard Oil Co. of Kansas, Tex.Civ.App., 67 S.W.2d 919, page 921: "On the same principle of law the affidavit made by Wiggins in proof of his occupancy of the Travathan was a circumstance against his limitation claim."

II. Did defendants show limitation title in themselves under the three year statute? Under their third counter point, defendants say that even if plaintiffs proved a limitation title under the occupancy expiring in 1907, nevertheless defendants subsequently reacquired the title to the land by adverse possession under the three year statute during the early 1920's. In support of this proposition they cite the recent decision of McMurrey Corp. v. Shell Oil Co., Tex.Civ.App., 173 S.W.2d 354.

■■ Defendants' contention is denied. The only record title proved is that originating with the patent to Augustus Wagner, dated April 16, 1852, some 40 years prior to the beginning of John Buck Wiggins' possession. If limitation title vested under the possession of John Buck Wiggins and family, it necessarily vested before the abandonment of the land by the Wiggins family about 1907; and under Article 5513, this limitation title would include, and thus the Wiggins family would acquire, the record title to whatever land the limitation title covered. Defendants therefore could not assert any claim under this record title subsequent to the time the limitation title vested in the Wiggins family, because they did not own this record title. On these grounds, the Supreme Court, in Burton's Heirs v. Carroll, 96 Tex. 320, 72 S.W. 581, have denied the very point made here by defendants and have held that the three year statute could not apply; and the Court of Civil Appeals reached the same conclusion in the decision of Grayson v. Peyton, Tex.Civ.App., 67 S. W. 1074. Other breaks in the record title

have prevented an application of the three year statute subsequent to the occurrence of the break. Paxton v. Meyer, 67 Tex. 96, 2 S.W. 817; Blum v. Rogers, 71 Tex. 668, 9 S.W. 595; Baldwin v. Root, 90 Tex. 546, 40 S.W. 3. And for other cases announcing the general rule that a claimant under the three year statute must hold possession and assert claim under title or color of title' is meant a consecutive chain of the sovereignty of the soil, see: Burnham v. Hardy Oil Co., 108 Tex. 555, 195 S.W. 1139; Green v. Hugo, 81 Tex. 452, 17 S. W. 79, 26 Am.St.Rep. 824; Snowden v. Rush, 69 Tex. 593, 6 S.W. 767; League v. Rogan, 59 Tex. 427. All of these decisions, of course, are only applications of Article 5508, R.S.1925, which so far as relevant provides: "By the term 'title' is meant a regular chain of transfers from or under the sovereignty of the soil, and by 'color of title extending unbroken to him from such transfers down to such person in possession, without being regular, * * *."

McMurrey Corp. v. Standard Oil Co. of Kansas, Tex.Civ.App., 173 S.W.2d 354, does not support defendants' argument because the opinion does not show that the "title" under which the three year statute was applied had originated before limitation title had vested under the 10 year statute. The Supreme Court apparently refused an application for a writ of error in that case, but we do not interpret the Supreme Court's action as overruling the decisions and the settled construction of Articles 5507 and 5508 to which we have referred above.

■ III. Did defendants prove as a matter of law that they had prima facie title to the land under Article 5519a? If they did, the instructed verdict should stand for plaintiffs did not rebut such a title. We hold, however that defendants did not prove a prima facie title under Article 5519a as a matter of law, because the proof does not show as a matter of law that defendants exercised dominion over the land throughout the 25 year period laid down by this statute.

(A) Article 5519a, so far as relevant, provides: "In all suits involving the title to land not claimed by the State, if it be

shown that those holding the apparent record title thereto have not exercised dominion over such land or have not paid taxes thereon, one or more years during the period of twenty-five years next preceding the filing of such suit and during such period the opposing parties and those whose estate they own are shown to have openly exercised dominion over and asserted claim to same and have paid taxes thereon annually before becoming delinquent for as many as twenty-five years during such period, such facts shall constitute prima facie proof that the title thereto had passed to such persons so exercising dominion over, claiming and paying taxes thereon."

The effect given this statute appears from Kellogg v. Southwestern Lbr. Co. of New Jersey, Tex.Civ.App., 44 S.W.2d 742, page 749 (headnote 13); W. T. Carter & Bros. v. Rhoden, Tex.Civ.App., 72 S. W.2d 620, page 626 (headnote 20); Duke v. Houston Oil Co., Tex.Civ.App., 128 S.W.2d 480, page 486; Whelan v. Henderson, Tex. Civ.App., 137 S.W.2d 150, page 153 (headnote 3).

■ (B) The terms dominion and claim, in this statute refer to separate and distinct requirements of equal significance. That is, in order to show a prima facie title under Article 5519a, defendants had to prove not only that they made claim to the land during the statutory period but that they also exercised dominion over the land during that period.

■ Dominion obviously refers to conduct under claim. The same act, of course, might prove both claim and dominion; but an act which expresses claim might not amount to dominion. The term dominion, distinguished as it is from claim suggests conduct upon the land itself, such as a patrol across the land to determine whether trespassers have settled upon it; and this court has held that such patrols constitute acts of dominion. Duke v. Houston Oil Company, Tex.Civ.App., 128 S.W.2d 480.

Dominion was defined as follows in Whelan v. Henderson, Tex.Civ.App., 137 S.W.2d 150, page 153 (headnote 5): "The exercise of dominion over land is such open acts and conduct relative thereto as evidence the claim of the right of absolute possession, use and ownership thereof." No division of the surface and subsurface estates was before the court in that case, and we construe the quoted statement as referring to the conduct of one claiming the fee title. The term dominion as used independently of Article 5519a was defined as follows in Baker v. Westcott, 73 Tex. 129, 11 S.W. 157, page 158: "The word 'dominion' means perfect control in right of ownership." This statement clearly refers to an incident of fee title. These two definitions, of course, are not inconsistent. That from Baker v. Westcott merely emphasizes an ordinary incident of fee ownership, namely, the assumption and exercise of exclusive control over the land claimed. It does suggest, however, more strongly than does Whelan v. Henderson, that the control assumed and exercised would extend to physical control, evidenced by acts upon the land itself, such as the patrol referred to above.

The circumstances of this case require that the term dominion in Article 5519a be more strictly defined than in Whelan v. Henderson; and, believing that the substance of this term involves matters too numerous and complicated to be expressed in any general definition, we will make such definition as is required here in terms of comments upon the facts before us.

Most of the matters to which we shall refer are necessarily involved in our determination of the question under discussion and such other matters as are not have been raised by the record in Houston Oil Co. of Texas et al. v. Mattie Neal et al., No. 4303 on the docket of this court. All of these matters will thus be before the trial court on a retrial of this cause, and the circumstances make it necessary for us to state our position in full detail.

Under this particular record, we will regard the 25 years ending on the date plaintiffs filed this suit, to-wit, March 1, 1940, as the 25 year period prescribed by Article 5519a. This 25 year period began on March 1, 1915. On that date, defendants' claim of title was owned by defendant Houston Oil Company, having been conveyed to Houston Oil by the Texas & Louisiana Land & Lumber Company by a deed dated July 30, 1901, purportedly con-

veying the Wagner survey and many other tracts.

The claim of title owned by Houston Oil on March 1, 1915, is now vested in defendants as follows (this statement is based upon the summary of defendants' title made by defendants in their brief):

(1) Houston Oil owns one-half of the oil and gas under a reservation made by that Company in a deed dated August 4, 1916, from said company to the Southwestern Settlement & Development Company, a business trust, which was the immediate predecessor in interest of defendant Southwestern Settlement & Development Corporation.

(2) Southwestern Settlement & Development Corporation owns the surface and one-half of the minerals other than oil and gas. This interest was conveyed to the aforesaid business trust under the deed of August 4, 1916, from Houston Oil; and it was conveyed by the business trust to the defendant corporation by a deed dated June 26, 1933.

(3) Defendant Republic Production Company (which is a Delaware corporation) owns one-half of the oil and gas and all other minerals. This interest was conveyed by Houston Oil Company and Southwestern Settlement & Development Company to a Texas corporation having the same name as this defendant, by a deed dated November 15, 1916. Republic of Texas then conveyed this interest to defendant Republic by a deed dated December 31, 1923.

We assume that such surface rights as defendants Houston Oil and Republic have are incidental to the mineral interests of these defendants.

We also note these additional facts, namely, that all acts upon the surface of the land have been the acts of Houston Oil and Southwestern (we make no distinction here or hereinafter between the business trust and the defendant Southwestern Corporation), that Republic has paid taxes and asserted claim to its interest in the minerals but has never done any act upon the surface of the land, and that none of the acts of Houston Oil and South-

western have been placed upon any specific part of the Wagner survey, but have been related generally as extending throughout said survey.

On these facts, we think the defendants' claim of dominion should be measured by the following comments:

(a) Considering first the case of one who claims fee-simple title to the tract covered by his purported dominion, we hold that the term dominion in Article 5519a primarily refers to and requires some physical conduct upon the land in suit which shows that the claimant is assuming to exercise physical control over the land, or over some part of it. The execution and delivery of deeds (without more) which purportedly convey the land, or an interest in the land, do not constitute the dominion required by the statute.

(b) Dominion under Article 5519a is not the equivalent of actual possession, but will ordinarily be something less than that. Therefore this dominion may be an accumulation of incidents which separately may affect only a part of the land claimed but which show as a whole that the claimant has assumed to exercise control of all of said land throughout the 25 year statutory period.

Further, the character, duration, number, spacing and times of the claimant's acts which make up the alleged dominion will certainly be affected by, and indeed, will usually be governed by the character of the land claimed. The land involved in this appeal is (and the entire Wagner survey seems to be) uninhabited, producing no crop except timber, and one claiming title to such land would ordinarily make only such entries upon this land as would protect him from loss of timber and wrongful possession. Yet these acts may very well satisfy the dominion requirement of Article 5519a.

Generally, then (considering still a claim of fee title), the acts constituting dominion, and the control over the land claimed which is evidenced by such acts, need only be such conduct and such control as would be done and exercised by an ordinarily prudent person who owned fee title to that very land during the 25 year period before the court.

(c) The comments in paragraphs (a) and (b) refer to the case where the alleged dominion coincides with the tract in suit. The facts before us show a different situation, for defendants claim the entire Wagner survey and as previously stated, their proof of dominion has been fixed upon the Wagner survey as distinguished from any particular part of that survey. However, such proof is sufficiently definite; for if defendants proved a 25 year dominion over the entire Wagner survey, they necessarily proved a dominion over the land in suit, which was only a part of that survey. Then, too, we think that Article 5519a requires dominion, not to convey notice of the claim evidenced by that dominion, but, instead, because it is a circumstance strongly tending to prove that the title claimed was really owned by the one who claimed that title.

(d) The proof shows a division of the surface and subsurface estates, and fails to show any dominion (in the sense we give that term) by Republic. The nature of the interest claimed in land will ordinarily determine what acts of dominion are to be performed by the claimant of that interest; and since one claiming an interest in the minerals in place usually has no right to use the surface except to explore for, or to drill for, or to produce his minerals, he would normally use the surface only for those purposes. Such a claimant would rarely be able to prove the dominion which is positively required of him and of all other claimants by Article 5519a if he were limited to his own conduct. However, we hold with regard to the defendants that each of them may assert as his own a dominion exercised by the other or others, at least in all of those situations where he could use a possession of the other, or others, to establish, either in whole or in part, a limitation title in his own behalf.

We proceed to consideration of the evidence.

Defendants' proof of dominion (as we construe that term) was made by the seven witnesses to which we shall now refer. These witnesses, except Barclay and Stone, were employees of one or the other of the defendants; and Barclay was a former employee of Houston Oil and of South-western. Only E. H. Hopson's employment extended throughout the 25 year period under consideration. Hopson had been continuously employed by Houston Oil since June 1, 1907. W. W. Cochran, an employee of Southwestern at the time of trial, was employed by Houston Oil in 1906, and remained in that company's employ until 1910. He reentered Houston Oil's employ on March 9, 1917, and he had been continuously employed since by Houston. Oil or by Southwestern. B. C. Barclay was employed by Houston Oil in 1919 and was an employee of that company or of Southwestern until 1938. W. W. DuBose, an employee of Houston Oil at the time of trial, entered the employ of Southwestern in May, 1928, and had since been continuously employed by Southwestern or by Houston Oil. W. E. Weathersby had been an employee of Southwestern since November 2, 1936. R. F. Evans entered the employ of Republic on March 12, 1937, and became an employee of Southwestern (for whom he worked at the time of trial) in May, 1942. Dudley O. Stone had been employed by Kirby Lumber corporation since August 15, 1940.

It conclusively appears from the testimony of these various witnesses that from March 1, 1915 (the beginning of the 25 year period before us) until the deed of August 4, 1916, to Southwestern Settlement & Development Company from Houston Oil, the Houston Oil Company had a well established system of inspecting its lands from time to time, to avoid loss from adverse possession and from other trespasses. This company organized its lands into various districts, and charged one or more employees in each district with the special duty of going upon the various tracts which the company claimed in that district, and viewing said lands for evidence of trespass. Any trespass discovered was immediately reported to responsible officials who determined what action the company would take. R. F. Evans said that this patrolling system was in force at least as early as April, 1901. Further, it was conclusively proven that Southwestern (we include in that term the original business trust and its successor, defendant Southwestern Settlement & Development Corporation) adopted and main-

tained a similar system after Houston Oil's deed of August 4, 1916, to the business trust; and that these patrols by Houston Oil and by Southwestern have on occasion extended to the Wagner survey. It seems to be true that Houston Oil has patrolled the Wagner survey since the deed of August 4, 1916; but we need not determine whether it has or has not.

The evidence shows the following specific entries upon the Wagner survey; E. H. Hopson proved a cruise of the Wagner in August, 1909, on behalf of Houston Oil by Banks and Coates, and this cruise must have covered the Wagner thoroughly for Banks and Coates estimated the timber. R. F. Evans proved another such timber estimate, made for Houston Oil by Boyd Bird about December, 1910, the inspector's report being dated December 4, 1910. However, the next entry for which a date is given must have been that of B. C. Barclay, who said he first went upon the Wagner survey "along in 1920, '21, '22; sometime in there." He was then employed either by Houston Oil or by Southwestern, and the extent of his view must be inferred from his statements that he found no squatters and no timber depredation upon the Wagner survey. He referred to other entries which he made upon the Wagner, but he gave no dates for these entries. Dudley O. Stone testified that Kirby Lumber Corporation cut timber off of the Wagner "from 1922 up to 1925," and further that Kirby purchased this timber "from the Houston Oil Company and Southwestern Settlement & Development Company under the contract of 1920." W. W. Cochran first went upon the Wagner on February 11, 1925, and again, on February 24th and 25th, apparently as an employee of Southwestern, to mark "the lines of Kirby's logging operations." He had been upon the survey since that time, but did not recall the dates. W. W. DuBose said he went upon the Wagner in 1935 in behalf of Southwestern and inspected the survey; that he went "over" the survey and found no trespassers, depredations, or evidence of a dwelling upon the survey. He went upon the Wagner again in 1936 for Southwestern, but said that he did not inspect it as thoroughly as he had done in 1935. W.

E. Weatherby inspected the survey for Southwestern in 1938 (his first entry upon the Wagner). He said that he was again on the survey in 1939 to scale 20 poles cut by a trespasser. He was also on the survey in 1940 and 1943, in behalf of Southwestern, apparently to make an inspection, but the extent of his view was not proven.

This testimony shows an interval of over ten years between Boyd Bird's cruise in 1910 and Barclay's entry in the early 1920's and since defendants' 25 years of dominion had to begin on March 1, 1915, more than one-half of this ten year interval fell upon the first part of defendants' 25 years. From March 1, 1915 until Barclay's entry in the early 1920's is at least one-fifth of the 25 year period required by Article 5519a. There was another extended interval between Cochran's entry in 1925 and the close of Kirby's timber operations in or about the same year, and the entry of DuBose in 1935. Each of these intervals extended beyond the three year and even beyond the five year periods for acquisition of title by adverse possession under Articles 5507 and 5509, R.S. 1925, and defendants had to furnish proof of dominion covering said intervals; for we must say as a matter of law that an ordinarily prudent person would enter upon his lands at such intervals as would protect him against loss of title by adverse possession.

Defendants have adduced some additional proof of dominion, but all of it is expressed in general terms. In effect, it consists of general statements to the effect that the patrolling system referred to above was always in operation and that it extended from time to time (no dates given) to the Wagner survey. E. H. Hopson said no more than that Houston Oil and Southwestern had had this system of patrolling their lands since his employment in 1907. The testimony of W. W. Cochran (1906 to 1910; March 9, 1917) is to the same effect. Barclay is a little more definite. He said that during the entire course of his employment (1919-1938) he "periodically and systematically went on the Wagner survey" for the purpose of protecting the survey against trespass; that other employees of Houston Oil and Southwestern were upon the survey for the same purpose

**262**

during this period; and that Southwestern removed some poles during this period. However, this testimony was in general terms. W. W. DuBose (1928) testified that it was an inspector's duty to "periodically patrol and inspect" his employer's lands and that this system of patrols and inspection had been maintained since Houston Oil had acquired its land. W. E. Weatherby (November 2, 1936) did not discuss the patrolling system. R. F. Evans (March 12, 1937) testifying from records and referring to all of the various defendants said that "at various times they have had it (the Wagner) cruised, inspected for protection purposes," and that the patrolling system was in operation as early as in April, 1901. Dudley O. Stone did not refer to the patrolling system.

There is no evidence here that any one went upon the Wagner survey between Boyd Bird's cruise in 1910 and Barclay's entry in the early 1920's, except as that fact may be inferred from the existence of the patrolling system, the claim of ownership by Houston Oil, and then, by Houston Oil and the predecessors of Southwestern and Republic, and the duty of the various inspectors to patrol the survey. It is in proof that during Barclay's employment (1919–1938) and since, employees of Houston Oil or Southwestern periodically and systematically performed their duty of inspecting the Wagner, but one is left to a process of inference to determine what a witness had in mind when he referred to periodical and systematic patrols or inspections.

Viewed as a whole, the testimony before us is too general to show as a matter of law that during the 25 year period from March 1, 1915 to March 1, 1940, the Houston Oil Company, and defendants (and the predecessors of Southwestern and Republic) since the conveyances to Southwestern (Company) and Republic of Texas, exercised the dominion over the Wagner which an ordinarily prudent person, owning that survey, would have exercised over the Wagner survey during that 25 year period.

These comments require that this cause be remanded for new trial. The judgment of the trial court is accordingly reversed, and the cause is remanded to the trial court for a new trial in accordance with this opinion.