**WADDELL et al. v. COLEMAN et al.**

No. 4731.

Court of Civil Appeals of Texas. Beaumont.

Oct. 25, 1951.

Rehearing Denied Jan. 16, 1952.

John T. Lindsey, Pt. Arthur, R. E. Biggs, Liberty, for appellants.

Grover C. Lowe, Woodville, A. M. Huffman, Beaumont, for appellees.

WALKER, Justice.

The action is in trespass to try title, to recover a tract of 100 acres of land in Hardin County, in the southeastern corner of the Frederick Helfenstein Survey. This corner is on Village Creek

and from it the boundary of the 100 acre tract runs north 850 varas along the eastern boundary of the Helfenstein Survey, and then turns and extends west a distance of 618 varas. From the point thus fixed, which is the northwestern corner of the 100 acre tract, the boundary extends south to Village Creek, and Village Creek is the southern boundary of the 100 acre tract.

Under the pleadings, the appellees were cross-plaintiffs and the appellants were cross-defendants, but the appellees will be referred to as plaintiffs and their cross-action as the petition, and the appellants will be referred to as defendants and their pleading as an answer and cross-action.

In addition to the formal allegations in trespass to try title and their prayer for recovery of the land, plaintiffs alleged that defendants had wrongfully cut and removed timber from the land and prayed recovery of damages.

The 100 acre tract in suit was the eastern 100 acres of a 160 acre tract on which M. C. Spell (Mack Spell) and his wife, Lucy Spell, had resided at a time many years before the present controversy arose but it is often referred to in the proof as the "Spell tract". M. C. Spell and Lucy Spell were divorced, and Lucy Spell married one Lock. After her marriage to Lock, she and her former husband sued one Chapman in whom, apparently, the title to the land was vested, to recover some land in the Helfenstein Survey which either was or included the 160 acre tract; and by a judgment dated July 7, 1919, which was rendered by agreement, Mrs. Lock and M. C. Spell recovered an undivided 100 acres of the 160 acres, which was to be surveyed so as to include the improvements they had made on the 160 acres. The 100 acre tract was surveyed later; the field notes are dated September 29, 1919. The title of Mrs. Lock and M. C. Spell was acquired by the plaintiff Lowe and the former plaintiff Tom Coleman and Mr. Lowe and Mr. Coleman conveyed the pine timber on the 100 acre tract to the Kirby Lumber Company by a deed dated February 14, 1920. The Kirby Lumber Company cut this timber in 1920.

Such title to the 100 acre tract as the defendants may have is founded upon adverse possession of a part of the 100 acre tract which, defendants say, amounted to a compliance with the 10-year statute of limitation, since the year 1920, by E. M. (or Emory) Waddell and his family. E. M. Waddell died in 1936. Of the defendants, Mrs. Emmie Waddell is the widow of E. M. Waddell; and the other defendants (except Lindsey, Diffey and Payne) are the children of E. M. Waddell and the husbands of some of these children. The rights of Lindsey, Diffey and Payne were derived from the other defendants.

The defendant Mrs. Emmie Waddell was the second wife of E. M. Waddell. She and Mr. Waddell were married in 1906 and established their home on a tract of land in the Bryan Survey which is east of, and adjoins, the 100 acre tract in suit. They apparently established their residence on this tract in 1909 and they resided there until 1927, and in that year they removed from this tract in the Bryan Survey to the community of Village Mills, where they resided until Mr. Waddell's death in 1936.

The western line and corners of the Waddell tract on the Bryan Survey coincide with the eastern line and corners of the 100 acre tract in suit. Some evidence was adduced which tended to show that the eastern line of the Helfenstein Survey, in which the 100 acre tract in suit is supposedly situated, was actually separated from the western line of the Bryan Survey by a vacancy which was about 145 or 150 varas wide, and that all of the land in suit which was held in actual possession by the Waddells lay on this vacancy. However, this question was resolved in the defendants' favor by the jury.

The cause was tried to a jury who returned the following answers to the Special Issues submitted to them: (1) The true eastern line of the 100 acre tract (which we construe as meaning the eastern line of the Helfenstein Survey) was the line identified in the evidence as running north 850 varas with the west line of the Bryan Survey; (2) defendants (other than Diffey and Payne) and E. M. Waddell held peace-

able and adverse possession of the 100 acres in suit, cultivating, using or enjoying, and claiming the same for a period of 10 years or more continually after the year 1920 and prior to 1948; (3) a preponderance of the evidence did not show that E. M. Waddell, within the period of 10 years found by them, acknowledged and recognized that Tom. F. Coleman and Grover C. Lowe, or either, were the owners of the land; and (4) a preponderance of the evidence did not show that E. M. Waddell at any time immediately prior to the date of the judgment in Lock v. Chapman acknowledged and recognized that Lucy Lock was the owner of the land.

Subsequently, the plaintiffs filed a motion for judgment non obstante veredicto, and this motion was sustained and judgment was rendered by the trial court that plaintiffs recover the title to and the possession of the 100 acre tract in suit. The trial court also rendered judgment in behalf of plaintiffs against defendants for $3,913.49, the value of the timber cut and removed by the defendants from the land. From this judgment the defendants have appealed.

Defendants have assigned nine Points of Error but these Points raise only the questions now to be discussed.

█ (1) A deed from Kirby to Chapman is an element of plaintiffs' chain of title, and defendants say that the description of the land conveyed by this deed did not cover the land in suit. In their argument under one of their Points, they make the same criticism of Mooney's deed to Kirby, which was another element of plaintiffs' chain of title. These contentions are overruled. It is the position of all parties that the land in suit is a part of the tract known as the Mack Spell or Lucy Lock tract, or "place", and that this Spell-Lock tract is in the Helfenstein Survey, and in Hardin County, on the north bank of Village Creek. Plaintiffs proved a patent to Frederick Helfenstein for a 1280 acre survey, and the description in Mooney's deed to Kirby and the description in Kirby's deed to Chapman obviously refer to the survey described in and

conveyed by this patent. Further, the proof showed that the 1280 acre survey thus patented to Helfenstein is the particular Helfenstein Survey in which the parties have located the Spell-Lock tract. Thus Grimes' field notes of the tract awarded to Mrs. Lock and Spell in their suit against Chapman are accompanied by, and obviously refer to, some field notes which are the field notes of the Helfenstein Survey described in the patent. The patent locates the survey in "Liberty District, Tyler County, on the north bank of Big Sandy Creek;" but Ellis, a surveyor, located the Spell-Lock tract in a Helfenstein Survey of 1280 acres which was located in both Hardin and Tyler Counties, on Village Creek, and he contended that he had found the original southeastern corner of the Helfenstein Survey which is described in the patent mentioned above, but located at a point 145 or 150 varas west of the point contended for by the defendants as the southeastern corner of the Helfenstein Survey in which the Spell-Lock tract is located. Ellis was, unquestionably, referring to the same Helfenstein Survey as is described in the patent. Hyde, another surveyor, obviously referring to the same southeastern corner, located this corner at the place for which the defendants contend as the southeastern corner of the Helfenstein Survey in which the Spell-Lock tract is located. Further, the judgment in behalf of Emory Waddell (who originated the adverse possession and claim on which defendants' claim of title by adverse possession is founded) against the Receiver of the Kirby Lumber Company not only identifies the 100 acres there awarded to Waddell with the tract recovered by Mrs. Lock and Spell from Chapman, but also describes the Helfenstein Survey in which it lies and identifies that with the survey described in the patent. As we have stated, this judgment in behalf of Mrs. Lock and Spell is an element of plaintiffs' chain of title, and defendants claim the benefit of the judgment in favor of Waddell. The deed to the defendant Lindsey from his co-defendant Mrs. Emmie Waddell, and Lindsey's later deed to Mrs. Waddell, also

use descriptions which are derived from the description in Waddell's judgment against the Receiver. Indeed, C. S. Holland's deed to E. M. Waddell, dated April 30, 1901, conveying what seems to be the Spell tract describes the Helfenstein Survey so as to identify it with that conveyed by the patent. The patentee conveyed the survey to Maes, and later deeds from the heirs of Maes to persons who are in plaintiffs' chain of title refer to the survey as being in Hardin County and identify Big Sandy Creek with Village Creek. As we read the proof, the parties are really not in disagreement about the identity of the particular Helfenstein Survey in which the Spell-Lock tract is situated.

 (2) In paragraph 4 of the answer which defendants filed on March 14, 1950, defendants plead certain matters as an estoppel against plaintiffs, and on June 14, 1950, plaintiffs filed a reply to this answer (and defendants' accompanying cross-action) in which they excepted to the plea of estoppel. These exceptions were sustained, and Point 9 assigns error to the order sustaining the exceptions. Point 9 has been considered, but it is overruled. The exceptions were properly sustained. It is also to be noted that the evidence affirmatively disproved any estoppel. Defendants' plea runs against the appellee, and former plaintiff, Tom Coleman, as well as against the plaintiff Lowe, but the evidence shows that Mr. Coleman had no connection with the transactions on which the claim of estoppel is founded, and thus his interest, now vested in the plaintiff C. G. Coleman, could not be affected by the estoppel claimed. As regards the interest of the plaintiff Lowe, it must be said that defendants do not deny that he proved a paper title to his interest in the land if the description in the deed from Kirby to Chapman covered the land in suit; and this being true the transactions relied on for an estoppel could not have operated as a conveyance of such a title. It is also evident that defendants and their predecessor in claim, E. M. Waddell, did not suffer any loss from the transactions alleged as an estoppel. Not only did the defendant Lindsey prosecute a suit against the party

used in the petition filed by Lowe and Hightower; defendants also offered proof of a retraction by Waddell of any authority he may have given the plaintiff Lowe, dated not long after the petition signed by Lowe and Hightower was filed.

 Points 6 and 7 assign error to the exclusion of various documents, most of which were referred to in the plea of estoppel which was stricken. The substance of these assignments is that the documents were proof that plaintiffs had notice of defendants' claim to the land. Since neither appellee Tom Coleman nor his successors in title had any connection with the transactions in which these documents were involved, the interest in the land which he formerly owned, now vested, as stated, in plaintiff C. G. Coleman, could not be affected by the subject matter of these points and as to the appellees Coleman, Points 6 and 7 are overruled. As regards the interest of the plaintiff Lowe, it may be said that the exclusion of this evidence did not affect the verdict of the jury, for this was in favor of the defendants; and if these papers should have been admitted, the error in excluding them was harmless so far as the verdict is concerned. Further, all of these papers were made and delivered in 1933, and as we construe the proof, adverse possession for 10 years after the dates of these instruments was not shown.

(3) The final question raised by the appeal is whether the evidence is sufficient to sustain the jury's answer to Issue 2, that the defendants (other than Diffey and Payne) had held peaceable and adverse possession of the 100 acre tract in suit, cultivating, using or enjoying and claiming the same for a period of 10 years or more continuously after 1920 and prior to 1948. The proof relevant to this question, some of it already mentioned, may be summarized as follows (only the proof which supports the jury's finding needs to be emphasized):

The period of time under consideration begins with the year 1921 and ends with the year 1947.

Two tracts of land are involved in the inquiry. One tract is that situated in the Bryan Survey, on which E. M. Waddell

and his family resided, from 1909 until a time in 1927, when they moved away from this tract and established their residence at Village Mills. They resided at Village Mills, which was only a few miles away from the land in suit, until Waddell's death in 1936. The evidence concerning the occupancy of the Waddell tract in the Bryan Survey is in conflict, but there is evidence that Brack Waddell, a son of E. M. Waddell, and his family succeeded E. M. Waddell in the occupancy of the tract on the Bryan. According to the defendant J. E. Waddell, who is also a son of E. M. Waddell, his father left the tract on the Bryan in August, 1927, and Brack Waddell established his residence upon that tract in the following Spring in 1928. The evidence concerning the duration of Brack Waddell's occupancy of the tract on the Bryan is also in conflict, but there is some testimony by J. E. Waddell that Brack Waddell and his family resided there continuously until 1947.

The other tract of land involved in the inquiry is the land in suit, and as we have heretofore stated, its lies immediately west of and adjoining the Waddell tract on the Bryan Survey. The land in suit is the eastern 100 acres of a 160 acre tract referred to in the proof as the Spell tract or "place". This tract covered 160 acres of land and its boundaries were surveyed and marked at least as early as 1913. The field notes of the 160 acre tract are contained in the judgment rendered in behalf of Lucy Lock and Spell in their suit against Chapman; and as there described, the tract is 857 varas long from north to south on the eastern boundary line and is 950 varas wide from east to west on the northern boundary line. The land in suit was not surveyed until after the rendition of the judgment in favor of Mrs. Lock and Spell against Chapman, which awarded Mrs. Lock and Spell an undivided 100 acres of the 160 acre tract. This judgment was dated July 7, 1919; and the field notes of the 100 acres set aside to Mrs. Lock and Spell by the subsequent survey are dated September 29, 1919. These field notes make the eastern boundary line 850 varas long and the northern boundary line 618 varas long. There was evidence that the common lines of the land in suit

and of the Waddell tract on the Bryan survey were of the same length, and that the northern line of the land in suit was in effect an extension westward of the northern line of the Waddell tract. Either the boundaries of the Spell 160 acre tract, or of the 100 acre tract in suit, or both of them, have been marked and defined on the ground throughout the period of time under consideration; and during this period were known to, and were recognized by, the members of the Waddell family and by other persons who resided in that area.

The evidence does not clearly show where the Waddell improvements were located upon the tract in the Bryan Survey, but from such evidence as there is concerning the location of the home of Mack and Lucy Spell, we infer that the Waddell improvements were located in the southwestern part of the Waddell tract on the Bryan survey.

The improvements of Mr. Waddell consisted of a dwelling house, a barn, fences and at least one field. The house was located at a distance of between 100 and 200 yards from the western line of the Bryan survey, probably a little more than 150 yards. The barn was nearer the western line of the Bryan survey. North of the barn was a small field which was inclosed by a rail fence, and this fence extended over to the western line of the Bryan survey and down it in a southerly direction as to include the barn and form a barnyard. A lane extended from the house to a gate in this fence, apparently in the western part of the fence.

There was testimony that the western fence extended across the western line of the Bryan survey for an appreciable distance into the land under consideration. Thus the witness Jenkins testified: "Q. That fence extended over to, (that is, E. M. Waddell's) west line, didn't it? A. Oh yes, it went over his west line, I would say, probably a hundred yards. Q. You think his fence went over his line. Is it not a fact his fence went right down his line? A. I would not be positive right there, but he (that is, E. M. Waddell) told me it was on the line. That is all I know." The defendant J. E. Waddell testified: "Q. Now that fence to that inclosure went over to

the line and ran down the line to or past the barnyard, didn't it, then turn there in back toward the house? A. You mean on the section line of the Luke Bryan and the Helfenstein? Not right on it, no, sir. Q. It wasn't right on the line? A. No, sir. Q. It was practically right on the line? A. Yes, right close, but it wasn't on it." There was testimony from Ellis and Davis which tended to show that the variation of the fence from the line of the Bryan survey was slight.

The tract of land in suit was not inclosed during the period of time under consideration, and neither it nor the larger 160 acre tract of which it was a part seems ever to have been wholly inclosed. However, for a period beginning with 1921 and continuing more than 10 years thereafter a small part of the land in suit was inclosed and was in the actual possession of E. M. Waddell or of persons whom the defendants say were tenants of E. M. Waddell. For convenience, this part of the land in suit will be referred to as the garden.

This garden lay west of the fence inclosing the Waddell improvements on the Bryan survey. It was completely inclosed by a rail fence and this fence was not connected with the fence around the Waddell improvements. A space of ground intervened between the garden fence and the Waddell fence. Concerning this space of ground, J. E. Waddell testified: "Q. No passage way through there? A. Yes, there was a passage way through there, but nothing cleared up. It was just brush. Q. You had fences on both sides of it, wasn't it? A. Yes, a fence. There was a lane that could be called a lane between the little patch and the Luke Bryan line and the Helfenstein line. Q. And that was where the little inclosure was you talked about? A. On the west, that is right. On the west."

The testimony concerning the size of this garden was in conflict, but there was testimony that it amounted to approximately two acres. J. E. Waddell testified: "There was about an acre and a half or two acres." C. S. McGraw testified: "They had a garden * * * about two acres, I judge it to be." Mrs. E. M. Waddell testified that this garden was "somewhere about two acres."

The testimony concerning the distance between the garden fence and the Waddell fence was in conflict. Thus the appellee Tom Coleman estimated this distance as "not over 30 steps. I am sure it wasn't over 30 steps." The surveyor Ellis, who separated the Helfenstein and Bryan surveys by a vacancy 145 or 150 varas wide, said that the Helfenstein eastern line ran west of the garden, and thus he put the entire garden and the space between the garden fence and the Waddell fence within the space of 145 or 150 varas. He also estimated the distance between the two fences as being not more than 100 feet. However, there was testimony from the following witnesses, who were familiar with the facts, which would have supported a finding that the space between the garden fence and the Waddell fence amounted to as much as 150 yards. Thus the defendant J. E. Waddell testified: "A. The piece of land, yes, was west of our fence there. Q. About 150 yards? A. Yes." And further: "Q. How far was that fence from your home place fence that was in the home place survey? A. It was about a 150 yards. Fully that far." The witness Jenkins testified: "A. There was two fences in there. Q. Well, how close together was that? A. I would say they were a 100 yards apart. * * * A. I would estimate that. I would not be positive, but I am pretty sure it was a 100 yards. It could be a little farther." The witness C. S. McGraw testified: "I would say it was something like 150 or 200 yards. I would not be exact."

The evidence concerning the use and occupation of the garden and of the rest of the land in suit was in conflict in many respects and it contains a number of generalities and ambiguities but there is evidence which tends to show the following matters:

E. M. Waddell claimed to own the land in suit during that part of the period of time under consideration which intervened prior to his death, that is, from 1920 until a time in 1936, and after his death, his heirs, that is, his children and his widow Mrs. Emmie Waddell claimed to own it. Among

these heirs is J. E. Waddell, a son of E. M. Waddell. He testified on the trial of the cause, and it is to be inferred from his testimony that he did not claim the land during his father's lifetime.

There was evidence that E. M. Waddell's claim originated prior to 1920, but the witness Jenkins testified that E. M. Waddell "went on there along in 1920, fenced it then;" and C. S. McGraw said that he had first seen the garden farmed "around 1920, something like that." E. M. Waddell, and after him, his heirs, apparently claimed the entire Spell 160 acre tract for at least a part of the period of time under consideration, but the actual possession of the Waddells has always been within the limits of the 100 acre tract in suit, which is, as we have stated, the eastern 100 acres of the Spell 160 acre tract.

It is apparent that the garden was established on the Spell tract by design and was not put there by mistake.

The claim by E. M. Waddell and his heirs has been evidenced by statements of claims and also by various acts of dominion upon the land and by the cultivation and use of the garden. The acts of dominion clearly shown by the evidence consist of the use and the sale of timber growing on the land. At various times during the lifetime of E. M. Waddell and the period in question, Mr. Waddell and the members of his family cut timber growing on the Spell 160 acre tract and manufactured it into posts and rails, with which they made the fences inclosing their improvements; and they also manufactured some of this timber into boards and used these boards in making the barn, or crib, on the Waddell tract. There is some general testimony that such a use of the timber had been made since Mr. Waddell's death. The Waddells, that is, E. M. Waddell and other members of his family, seem to have gone about over the entire Spell 160 acre tract to get this timber, but in doing so they recognized as their lines, either the boundaries of the 160 acre tract or those of the 100 acres in suit.

Timber on the land has been sold at least twice, once to Jerry Hall and once again to Diffey and Payne. There was some testi-

mony that the sale to Hall was made after E. M. Waddell's death, and that it occurred in 1936 or 1937, but there was also some testimony that it was made in 1932. The sale to Davis and Payne was made in 1947 or in 1948.

(c) The testimony concerning the cultivation and use of the garden is in conflict, but there is substantial evidence that it was cultivated annually and continuously for a period of more than 10 years, beginning with 1921.

The defendant J. E. Waddell said that he had cultivated the garden in 1921, 1922 and 1923 and that Brack Waddell began to cultivate the garden in 1924 and did so for as long as 7 years.

J. E. Waddell and Brack Waddell were sons of E. M. Waddell. While J. E. Waddell was cultivating the garden in 1921, 1922 and 1923, he resided at Village Mills but went to and fro between his father's home and his own home, and at the same time that he was cultivating the garden, he was also cultivating a part of the tract on which his father and other members of his family were residing. It is a reasonable inference from all of the other circumstances, including the fact that his father was claiming the land in suit, that J. E. Waddell's use of the garden was made as a tenant of his father, and the testimony of Jenkins now to be mentioned, which indicates that Jenkins attributed the cultivation made by J. E. Waddell to the father E. M. Waddell, is a supporting circumstance. If Jenkins did not identify J. E. Waddell's cultivation with E. M. Waddell's conduct, then his statement means that E. M. Waddell himself cultivated the garden until Brack Waddell began to do so.

The witness Jenkins testified that E. M. Waddell "went on there along in 1920, fenced it then, and he stayed there about 7 or 8 years and then put a renter on it, and he must have stayed there, I will say, 14 years, or close to 14." That renter was one of E. M. Waddell's boys, Brack Waddell. Jenkins said that he had helped E. M. Waddell cut timber on the Spell tract for boards and rails. E. M. Waddell said that he owned that land, the land known as the Spell place. What did Waddell tell him in

1920 or 1921 with reference to who owned the land? "I was up there one day and penned a bunch of hogs in a new pen he had built over there, and he had rails split all over that part of the country, and I was hurrahing him about what he was doing and he said he was fencing up some more land, had a new piece of ground there, and it was his, and he was fencing up around it then."

C. S. McGraw testified that Waddell and the Waddell heirs "have been cutting the timber off of it and using it, and they had a garden * * * about two acres, I judge it to be." He had seen the garden growing out there; it was under fence; a stock proof fence; a ten-rail fence; he first saw the garden farmed "around 1920, something like that;" "it was cultivated every year." Mr. Waddell moved to Village Mills around 1927. His son Brack moved on the old Waddell place. That Spell place was farmed each year until Brack Waddell moved on it. Brack Waddell lived on the Waddell place 12 or 14 years. He is not sure but he thinks that the garden was last cultivated in 1948. He is not positive that it was cultivated that year.

Doubtless the garden was used for the benefit of the occupant of the improvements on the Waddell tract, but the jury need not have found that it was used for that purpose during the years of cultivation prior to Brack Waddell's entry.

(d) There is some general testimony that after Brack Waddell ceased to cultivate the garden he used it for a pen or pasture. We have not been able to determine from the proof exactly how long or how often this use was made.

(e) None of this possession and dominion was under a recorded memorandum of title before February 5, 1935. On that date was filed the judgment in behalf of E. M. Waddell against the Receiver of the Kirby Lumber Company, rendered by the U. S. District Court on January 30, 1935, for the 100 acre tract in suit. Subsequently, by a deed dated January 8, 1937 and filed for record the same day, the defendant Mrs. Emmie Waddell conveyed one-half of this tract to the defendant John Lindsey, and by a deed dated March 1, 1937, filed for record on March 12, 1927, the defendant Lindsey conveyed a 52.5 acre tract out of this 100 acre tract to Mrs. Waddell. It is not entirely clear to us whether these two deeds are in evidence for all purposes, and the effect of these two deeds upon the title to the Waddells' claim is also not clear. However, since the cultivation of the garden had been made for more than 10 years prior to the date of the judgment mentioned, these two deeds are immaterial to the plaintiffs and will therefore be disregarded.

(f) It affirmatively appears from their testimony that the plaintiff Lowe and the appellee (and former plaintiff) Tom Coleman thought that E. M. Waddell had established the garden on the land in suit at the time judgment was rendered against Chapman in favor of Mrs. Lock and Spell. This judgment was rendered in 1919, and Mr. Lowe and Mr. Coleman were the attorneys who represented Mrs. Lock and Mr. Spell. Mr. Coleman testified that Mr. Waddell, who was the brother of Mrs. Lock, was looking after the land for his sister and her husband at the time, that Mr. Waddell assisted him and Mr. Lowe in the prosecution of the suit, and that before the judgment was rendered, Mr. Waddell made an acknowledgment in behalf of Mr. Coleman that he was a tenant on the land. Mr. Coleman said that this acknowledgment was procured at the request of the attorneys who represented Chapman. The acknowledgment had been lost and it was not of record. Mr. Lowe also gave some testimony to the same effect but it was subsequently excluded.

These comments conclude our statement of the relevant proof. Plaintiffs state three grounds for disregarding the finding under Issue 2.

Their first ground is: "It is uncontroverted in the record that Emory Waddell was looking after the land for his sister, Lucy Lock, prior to the J. R. Chapman judgment in 1919 and that thereafter he was the tenant of Tom F. Coleman and Grover C. Lowe."

■ This statement is based upon the testimony of the appellee Tom Coleman;

similar testimony by the plaintiff Lowe was stricken because in conflict with Article 3716, R.S. 1925. Mr. Coleman's testimony on the points mentioned in the ground just quoted was not disputed (indeed, no other person testified regarding these matters except the plaintiff Lowe), but we hold that under the circumstances Mr. Coleman's testimony only raised an issue of fact for the jury. Thus: the transaction was old, having occurred in 1919 and Mr. Coleman having testified in 1950; the other party to the transaction, Mr. E. M. Waddell, was dead; Monroe Reese, whom Mr. Coleman said witnessed Waddell's signature to an acknowledgement of tenancy, did not testify and his absence was not accounted for; the acknowledgment of tenancy by E. M. Waddell, to which Mr. Coleman testified, had been lost and was not of record; Mr. Coleman's statement that E. M. Waddell wrote "E. M. Waddell" in his own hand, as his signature to the acknowledgment of tenancy, was disputed by J. E. Waddell who testified that his father E. M. Waddell could not write his name and always made his signature by mark, and the deed from E. M. *Wattle* (whom the plaintiffs seem to say was E. M. Waddell) to M. C. Spell, conveying the Spell 160 acre tract, was signed "E. (his mark) M. Wattle"; Mr. Coleman's testimony concerning the size of the garden and the distance between the garden fence and Waddell's fence was contradicted.

Plaintiffs' second ground is: "There is no continuous period of 10 years adverse possession shown by Emory Waddell or any person or persons cultivating it for him."

The evidence which we have summarized above is to the contrary. As we have stated, there was evidence that the garden on the land in suit was cultivated annually for a period of more than 10 years, beginning with 1921, and there was also evidence of various acts of dominion over the land during this period which sufficiently expressed the Waddell claim. The circumstances attending the cultivation of the garden by J. E. Waddell were sufficient to show that he was his father's tenant. The fact of tenancy can be proved by circumstances as well as any

other fact can be, and in such a case as this, where Article 3716, R.S. 1925, inhibited testimony by J. E. Waddell concerning his transactions with his father, circumstantial proof was a necessary part of the defendants' case. Since there was affirmative testimony that Brack Waddell was a tenant of E. M. Waddell, our conclusion respecting the fact of J. E. Waddell's tenancy necessarily showed the required continuity of use by E. M. Waddell, and privity between J. E. Waddell and his brother Brack. But the statement of the witness Jenkins quoted above, that E. M. Waddell "went there along in 1920, fenced it then, and he stayed there about 7 or 8 years and then put a renter on it," and the testimony of C. S. McGraw, which was, in effect, that he first saw the garden being farmed "around 1920, something like that," somewhere near in the year 1920, 1921 and through there, and that "it (meaning the garden) was cultivated every year," and that the Spell place was farmed each and every year until Brack Waddell moved on it," would have supported a finding that if Jenkins had not identified J. E. Waddell's cultivation with his father's, then E. M. Waddell himself cultivated the garden until Brack Waddell began to cultivate it. There was, as we have stated, affirmative testimony that Brack Waddell was a tenant of his father E. M. Waddell. Annual cultivation of the garden was sufficient possession thereof. See: 2 Tex.Jur. 86 (Sec. 45); Wiggins v. Houston Oil Co., Tex.Civ. App., 203 S.W.2d 252 (Hn. 3). The jury could also have found that the interruption in the possession of the Waddell tract between Waddell's removal in August, 1927, and Brack's entry in the spring of 1928 did not interrupt the annual cultivation of the garden.

The plaintiffs' third ground is: "That the small garden inclosed was a part of his home place (meaning the home place of E. M. Waddell), an incidental improvement to his home place, and could not under the law constitute adverse possession of the 100 acres of land."

Whether this ground is good is a doubtful question, but we have concluded that the proof raised an issue for the

jury. The proof to which we refer is that concerning the possession and use of the land during E. M. Waddell's lifetime; the proof concerning the use after Waddell's death is not sufficiently definite or clear to show continuous adverse possession of any part of the land. The question to be decided is, were the circumstances sufficient to put the owners of the 100 acre tract in suit on notice that E. M. Waddell was claiming all of the land? or, since the answer to this question depends upon the significance and effect to be given Waddell's possession and use of the garden, whether the owners of the land in suit could consider Waddell's use of the garden "to be a part of that rightfully asserted by the possessor of his own land"? The words quoted are from Smith v. Jones, 103 Tex. 632, 132 S.W. 469, at page 470, 31 L.R.A.,N.S., 153. This question, in turn, seems to be one of degree and to depend, to some extent at least, upon the area held in adverse possession and its location with reference to the boundaries of the land in suit and to the improvements of the claimant. For unquestionably, E. M. Waddell had the legal capacity to establish a separate possession on the land in suit, whether it adjoined the tract on which he resided or not, and by virtue of this separate possession to acquire title to the entire 100 acre tract under the 10-year statute, Art. 5510, R.S. 1925. The following proof, of that summarized above, would support a finding that E. M. Waddell's possession and use of the garden was a separate possession, distinct from that of his tract on the Bryan Survey and that it could not be considered "to be a part of that rightfully asserted by (Waddell) of his own land:" (1) The garden was of substantial size, that is, approximately 2 acres. If 2 acres of a 100 acre tract is not enough, how much of the 100 acre tract must have been held in possession to give notice of an adverse claim to the whole? (2) The garden lay an appreciable distance from the Waddell improvements, and was completely separated from those improvements. J. E. Waddell testified, in effect, that except for a lane the space between the garden fence and the Waddell fence was covered with brush. (3) The jury could have found that the distance between the garden fence and the Waddell fence amounted to 150 yards and that the Waddell fence extended for at least a short distance over the boundary to the tract in suit. As a consequence they could have found that the garden fence lay approximately 200 yards from the eastern line of the land in suit. The tract in suit is only 618 varas, that is, 572.2 yards wide, and if the garden were as much as 200 yards away from the eastern boundary of the tract in suit, its western line would lie not very far away from the center of the tract in suit. (4) Appellees Lowe and Tom Coleman knew, during the entire period in controversy, that the Waddell garden was located on the tract of land in suit. We have found no case in point on the facts but the circumstances before us are stronger, in point of degree, than those held insufficient in the following decisions: Bracken v. Jones, 63 Tex. 184; Holland v. Nance, 102 Tex. 177, 114 S.W. 346; Bender v. Brooks, 103 Tex. 329, 127 S.W. 168; Fielder v. Houston Oil Co., Tex.Com.App., 208 S.W. 158; Id., Tex.Com.App., 210 S.W. 797; Temple Lumber Co. v. Low, Tex.Com.App., 272 S.W. 769; R. W. Weir Lbr. Co. v. Eaves, Tex.Com.App., 296 S.W. 481; Bailey v. Kirby Lumber Co., Tex.Civ.App., 195 S.W. 221; Smith v. Alexander-Gilmer Lumber Co., Tex.Civ.App., 242 S.W. 767. The following decisions involve facts which are more or less like those before us and which were sufficient to raise the issue of limitation title: Lutcher v. Reed, Tex.Com. App., 237 S.W. 913; Houston Oil Co. v. Griffin, Tex.Civ.App., 166 S.W. 902; W. T. Carter & Bro. v. Richardson, Tex.Com. App., 236 S.W. 978 (cultivation of 3 or 4 acres of a 160 acre tract for 5 years was enough. The cultivation was by a tenant who lived on another tract, and about one-quarter of a mile from the cultivated tract. One-quarter of a mile is 440 yards —as contrasted with the possible 150 yards between the garden fence and the Waddell fence. That the possession was under a deed is immaterial since the possession on the ground must be sufficient to put the owner on inquiry regarding the deed records. See: Holland v. Nance, supra; and McBurney v. Knox, 111 Tex. 510, 241 S.W.

1000, at page 1001; Vergara v. Myers, Tex. Com.App., 239 S.W. 942 (extension of a field into the survey, covering 4 or 5 years. Also on the survey were a tank and two reservoirs. According to the order of the Supreme Court there was an issue of fact as to the sufficiency of notice of adverse possession); McBurney v. Knox, Tex. Com.App., 273 S.W. 819, 820, 2nd appeal. Court of Civil Appeals opinion at 259 S.W. 667. The occupant entered and began his clearing about 250 or 300 yards from the boundary. The clearing became an inclosed field which eventually covered as much as 25 acres of a 354.5 acre survey. About two years after this entry, the occupant erected his dwelling house on an adjoining survey, about 400 yards east of his field. The Commission of Appeals said, in discussing the argument that the use of the field should be referred to the dwelling place; "The trial court found that (occupant's) entry upon this land was not made by the extension of any field, inclosure, or clearing of any character from any adjacent or continuous tract of land." That the occupant erected his dwelling after he made his field ought not to be material because both events occurred during the limitation period and the occupant must have notice during this entire period and not merely during that part of the period before the house was erected; Houston Oil Co. v. Griffin, Tex.Civ.App., 166 S.W. 902; Petty v. Griffin, Tex.Civ.App., 241 S.W. 252; Manning v. Standard Oil Co., Tex.Civ.App., 67 S.W.2d 919, where this Court held that the evidence raised an issue for the jury. In our opinion it was an issue for the jury as to whether the encroachment doctrine was applicable to this case or not. Under the Points of Error assigned, we have only to decide whether there is any evidence which supports the jury's finding under Issue 2 and we are not concerned with the sufficiency of this evidence as a matter of fact.

This conclusion requires that the judgment of the trial court be reversed; and, no cross assignment having been filed by the plaintiffs, judgment must be rendered on the verdict in behalf of defendants against the plaintiffs that the said defendants recover the land in suit and that plaintiffs' claim of damages for the removal of timber be denied.

It is so ordered.